**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **CONTINENTAL COMMON, INC,** | § | **Case No.  10-37542-HDH** |
| | § | **Chapter 11** |
| **Debtor.** | § | |

**DISCLOSURE STATEMENT UNDER 11 U.S.C. 1125**
**IN SUPPORT OF THE JOINT**
**PLAN OF REORGANIZATION DATED JUNE 14, 2011**

**TABLE OF CONTENTS**

Page

I.      SUMMARY OF THE PLAN ...........................................................................8

II.     CONSIDERATIONS IN PREPARATION OF THE DISCLOSURE
        STATEMENT AND PLAN; DISCLAIMERS................................................9
        A.      Disclosure Statement; Construction...............................................11
        B.      Sources of Information ...................................................................11

III.    VOTING PROCEDURES .........................................................................12
        A.      "Voting Claims" -- Parties Entitled to Vote ..................................13
        B.      Return of Ballots ...........................................................................13
                1.      Deadline for Submission of Ballots ....................................13
                2.      Solicitation of Acceptances..................................................14
                3.      Acceptance by Impaired Classes of Claims...........................15
                4.      Cramdown................................................................................15
        C.      The Confirmation Hearing And Objection Deadline.............................15
        D.      Recommendation Of Plan Proponents To Approve Plan ......................16

IV.     EXPLANATION OF CHAPTER 11 ...........................................................17
        A.      Overview of Chapter 11 .................................................................17
        B.      Purpose of Disclosure Statement ..................................................17
        C.      Plan of Reorganization and Confirmation .......................................18

V.      BACKGROUND OF THE DEBTOR .........................................................19
        A.      Nature of the Debtor's Business. ...................................................19
        B.      The Debtor's Indebtedness and Creditors......................................21

VI.     EVENTS LEADING TO BANKRUPTCY FILING AND OPERATIONS IN
        BANKRUPTCY ........................................................................................21
        A.      The Appointment of a Receiver over the 1010 Common Property ......21
        B.      Filing of the Debtor's Chapter 11 Bankruptcy Case.............................21
        C.      Acquisition of Properties and of Debtor's stock by Warren Road Farm,
                Inc. ..................................................................................................22
        D.      Pending Litigation..........................................................................22
        E.      Operations of the Debtor during the Pendency of the Case.................22
        F.      Professionals Being Paid by the Debtor and Fees to Date....................23
                1.      Professionals employed by the Debtor. ....................................23
                2.      Fees to Date..........................................................................23

VII.    DESCRIPTION OF THE PLAN ................................................................23
        A.      Introduction....................................................................................23
        B.      Designation of Claims and Interests ...............................................24
        C.      Treatment of Claims and Interests .................................................24
                1.      Class 1: Administrative Expense and Certain Priority Claims. .................28
                2.      Class 2: Certain Priority Claims ..............................................29
                3.      Class 3 Claim- Allowed Secured Claims of Taxing Authorities ..............30
                4.      Class 4: Allowed Secured Claim of PNC ..................................30

| | 5. | Class 5: Allowed Secured Claim of Propel..................................................34 |
|---|---|---|
| | 6. | Class 6: Allowed Secured Claim of John Monlezun ................................34 |
| | 7. | Class 7: Convenience Class of Unsecured Claims Less than $2,500.00 ...35 |
| | 8. | Class 8: Allowed General Unsecured Claims ..........................................35 |
| | 9. | Class 9: General Unsecured Claims of TCI and Continental Common Lease Inc ................................................................................................35 |
| | 10. | Class 10: Interests ...................................................................................35 |
| D. | | Additional Distributions to Creditors under Article VIII of the Plan ...................35 |
| E. | | Funding and Manner of Distribution of Property under the Plan .........................36 |
| | 1. | Funding of Plan.......................................................................................36 |
| | 2. | Distribution Procedures and Distribution Agent.....................................36 |
| | 3. | Disputed Claims or Interests...................................................................37 |
| | 4. | Manner of Payment under the Plan..........................................................37 |
| | 5. | Compliance with Tax Requirements........................................................37 |
| F. | | Treatment of Executory Contracts and Unexpired Leases. ..................................38 |
| | 1. | Motion to Assume....................................................................................38 |
| | 2. | Notice of Assumption .............................................................................38 |
| | 3. | Effect of Assumption ..............................................................................38 |
| | 4. | Cure Claims .............................................................................................38 |
| G. | | Treatment of Tenant Security Deposits. ..............................................................39 |
| H. | | Means for Execution and Implementation of the Plan..........................................39 |
| | 1. | TCI's Financial Contributions ................................................................39 |
| | 2. | Board of Directors of the Reorganized Debtor .......................................39 |
| | 3. | Post-Confirmation Management ..............................................................39 |
| | 4. | Rescission of Continental Common Lease Note ......................................40 |
| | 5. | Preservation of Causes of Action............................................................40 |
| I. | | Objections to Claims............................................................................................44 |
| | 1. | Time for Filing Claims............................................................................44 |
| | 2. | Objection Deadline .................................................................................44 |
| | 3. | Distributions on Account of Contested Claims .......................................45 |
| | 4. | No Waiver of Right to Object..................................................................45 |
| | 5. | Rights Under Section 505 .......................................................................45 |
| | 6. | Allowance of Contested Claims..............................................................45 |
| | 7. | Allowance of Certain Claims..................................................................45 |
| | 8. | Substantial Consummation .....................................................................46 |
| J. | | Conditions to Effectiveness of the Plan. .............................................................46 |
| K. | | Effects of Plan Confirmation. ..............................................................................47 |
| | 1. | Discharge .................................................................................................47 |
| | 2. | Legal Binding Effect...............................................................................48 |
| | 3. | Moratorium, Injunction and Limitation of Recourse For Payment ..........48 |
| | 4. | Term of Injunction or Stays ....................................................................49 |
| | 5. | Release and Covenant Not to Sue ...........................................................49 |
| | 6. | PNC Release and Covenant Not to Sue ...................................................50 |
| | 7. | Insurance .................................................................................................51 |
| | 8. | Revesting.................................................................................................51 |
| | 9. | Other Documents and Actions .................................................................51 |
| | 10. | Term of Injunctions or Stays...................................................................51 |
| L. | | Confirmability of Plan and Cramdown..................................................................51 |
| M. | | Retention of Jurisdiction. .....................................................................................51 |

| | N. | Securities Laws. | 52 |
|---|---|---|---|
| | O. | No Requirement of Final Order. | 53 |
| | P. | Assumption of Allowed Claims. | 53 |
| | Q. | Attorneys' Fees and Costs. | 53 |
| | R. | Post-Petition Taxes and Insurance. | 53 |
| | S. | Exemption from Transfer Taxes and Recording Fees. | 53 |
| | T. | Modification of Plan. | 54 |
| | U. | Waiver of Stay. | 54 |
| VIII. | | FEASIBILITY OF THE PLAN | 54 |
| | A. | Feasibility | 54 |
| | | 1. Projections | 55 |
| | B. | Alternatives to Confirmation of the Plan | 55 |
| | | 1. Dismissal. | 56 |
| | | 2. Chapter 7 Liquidation. | 56 |
| | | 3. Confirmation of an Alternative Plan. | 56 |
| IX. | | RISK FACTORS | 57 |
| X. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 58 |
| | A. | General. | 58 |
| | B. | Tax Consequences to the Debtor. | 58 |
| | C. | Tax Consequences to Creditors. | 59 |
| | D. | Creditors Receiving Solely Cash. | 59 |
| | E. | Backup Withholding. | 59 |
| XI. | | CONCLUSION | 59 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CONTINENTAL COMMON, INC, | § | Case No. 10-37542-HDH |
| | § | Chapter 11 |
| Debtor. | § | |

DISCLOSURE STATEMENT UNDER 11 U.S.C. 1125
IN SUPPORT OF THE JOINT
PLAN OF REORGANIZATION DATED JUNE 14, 2011

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY CONTINENTAL COMMON, INC. (THE "DEBTOR") AND DESCRIBES THE TERMS AND PROVISIONS OF THE JOINT PLAN OF REORGANIZATION OF CONTINENTAL COMMON, INC. DATED JUNE 14, 2011 (THE "PLAN") PROPOSED BY THE DEBTOR AND PNC BANK, N.A. ("PNC"). ANY TERM USED IN THIS DISCLOSURE STATEMENT THAT IS NOT DEFINED HEREIN HAS THE MEANING ASCRIBED TO THAT TERM IN THE PLAN. A COPY OF THE PLAN IS ATTACHED HERETO AS EXHIBIT A.

YOU MAY BE RECEIVING A COPY OF THIS DISCLOSURE STATEMENT AND THE PLAN BECAUSE YOU ARE A CREDITOR WITH CLAIMS ARISING FROM ONE OR MORE OF THE FOLLOWING PROPERTIES OWNED BY THE DEBTOR AND YOUR CLAIM MAY BE TREATED BY THE DEBTOR'S PLAN:

(I) AN OFFICE BUILDING LOCATED AT 1010 COMMON ST. IN NEW ORLEANS, LA 70112 (THE "1010 COMMON PROPERTY") AND VARIOUS GROUND LEASES AND LAND ASSOCIATED WITH THE 1010 COMMON PROPERTY FORMERLY OWNED BY CONTINENTAL COMMON LEASE, INC.

(II) APPROXIMATELY 43.433 ACRES OF UNDEVELOPED LAND LOCATED AT 4600, 5201, 5224, AND 5325 SHADYDELL CIRCLE IN FORT WORTH, TX (COLLECTIVELY, THE "MARINE CREEK PROPERTY") FORMERLY OWNED BY TRANSCONTINENTAL REALTY INVESTORS, INC.

(III) APPROXIMATELY 17.115 ACRES OF UNDEVELOPED LAND LOCATED AT 11600 LUNA ROAD, FARMERS BRANCH, TX (THE

**"LACY LONGHORN PROPERTY")** **FORMERLY OWNED BY TRANSCONTINENTAL REALTY INVESTORS, INC.**

**IF YOU ARE A CREDITOR OF THE DEBTOR AND/OR HAVE A CLAIM WITH RESPECT TO ANY OF THE ABOVE IDENTIFIED PROPERTIES, PLEASE DO NOT DISCARD THESE DOCUMENTS AND REVIEW THEM IN FULL, AS YOUR CLAIM IS LIKELY BEING TREATED IN THE DEBTOR'S PLAN.**

Dated: June 15, 2011

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@FSLHlaw.Com
**FRANKLIN SKIERSKI LOVALL HAYWARD LLP**
10501 N. Central Expy, Ste. 106
Dallas, Texas  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

**COUNSEL TO THE DEBTOR-IN-POSSESSION,
CONTINENTAL COMMON, INC.**

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, ANY SUPPLEMENTS TO THE PLAN, THE PLAN DOCUMENTS, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. MOREOVER, THERE MAY BE ERRORS IN THE STATEMENTS AND/OR FINANCIAL INFORMATION CONTAINED HEREIN AND/OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS AND/OR FINANCIAL INFORMATION. THE DEBTOR AND THE PLAN PROPONENTS AND THEIR RESPECTIVE ADVISORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT AND THE PLAN DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. TO THE EXTENT ANY RIGHTS, NOTES, OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, NEITHER THE OFFER NOR THE ISSUANCE OF ANY SUCH SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE 1933 ACT OR ANY SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ANY SUCH OFFER OR ISSUANCE IS BEING MADE IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO DO NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS

AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTOR AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR.

PNC, ALTHOUGH A CO-PROPONENT OF THE PLAN, IS NOT RESPONSIBLE FOR AND SHALL HAVE NO LIABILITY AS TO THE ACCURACY OR ADEQUACY OF ANY OF THE INFORMATION CONTAINED HEREIN.

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement includes information regarding certain "forward-looking statements" within the meaning of Section 27A of the 1933 Act and Section 21E of the Securities Exchange Act of 1934, as amended, all of which are based upon various estimates and assumptions that the Debtor believes to be reasonable as of the date hereof. These statements involve risks and uncertainties that could cause actual future outcomes to differ materially from those set forth in this Disclosure Statement. Such risks and uncertainties include, but are not limited to:

- litigation risks and uncertainties;

- costs associated with the Debtor's restructuring efforts, including its chapter 11 filing; and

- Claim and liability estimates.

You should understand that the foregoing as well as other risk factors discussed in this Disclosure Statement could cause future outcomes to differ materially from those expressed in such forward looking statements. Given the uncertainties, you are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote in favor of the Plan or to take any other action. The Debtor undertakes no obligation to update or revise information concerning the Debtor's restructuring efforts or its cash position or any forward-looking statements to reflect events or circumstances that may arise after the date of this Disclosure Statement, except as required by law.

# I.
## SUMMARY OF THE PLAN

The Joint Plan of Reorganization of Continental Common, Inc. dated June 14, 2011 (the "Plan") is being jointly proposed by Continental Common, Inc. (the "Debtor") and PNC Bank, N.A. ("PNC"). The Plan provides for the Debtor to continue to manage and operate the three properties it owns: (i) an office building located at 1010 Common St. in New Orleans, LA 70112 (the "1010 Common Property") and various ground leases and land associated with the 1010 Common Property; (ii) approximately 43.433 acres of undeveloped land located at 4600, 5201, 5224, and 5325 Shadydell Circle in Fort Worth, TX (collectively, the "Marine Creek Property"); and (iii) approximately 17.115 acres of undeveloped land located at 11600 Luna Road, Farmers Branch, TX (the "Lacy Longhorn Property", collectively with the 1010 Common Property and the Marine Creek Property, the "Properties").

Under the Plan, the Reorganized Debtor will use Net Cash Flow, funds received from Transcontinental Realty Investors, Inc. ("TCI"), the entity or its designee acquiring the equity of the Debtor, funds on deposit in the Debtor's various debtor-in-possession bank accounts, including, but not limited to, the tax escrow account and the $96,000.00 deposited by the Debtor into a special utility escrow account for the benefit of Entergy New Orleans, Inc., who has received a surety bond executed by TCI as adequate assurance of payment and in such funds' stead, collections of accounts receivable owed as of the Confirmation Date, funding from TCI, its designee, or any other entity, proceeds from sales or refinancing of the Properties, and any additional monies obtained by the Debtor to fund the Distributions required under the Plan to Classes 1, 2, 3, 5, 6, 7, 8, and 9.

Distributions to Class 4 Claimants shall be treated in accordance with Section 6.4 of the Plan and will be funded by Gross Revenue, funds received from TCI its designee, or any other entity, (either as capital contributions or in accordance with the obligations of TCI under the Plan Documents), funds on deposit in the Debtor's various debtor-in-possession bank accounts, including, but not limited to, the tax escrow account and the $96,000.00 deposited by the Debtor into a special utility escrow account for the benefit of Entergy New Orleans, Inc., collections of accounts receivable owed as of the Confirmation Date, insurance loss proceeds or payments, any award or other payment made by any governmental unit or authority in conjunction with the exercise or any right of eminent domain or condemnation, any proceeds from any sale, refinancing, exchange, or other disposition of the Properties, any payments made on account of any easements or access rights granted by the Debtor which are not material to the operation of the Property, and any additional monies obtained by the Debtor. TCI has agreed to make payments to PNC to the extent provided in the Plan Documents. TCI or its designee will receive 100% of the equity interests in the Reorganized Debtor on account of its contributions.

The perfected liens and security interests held by any lender, including PNC, will be continued, preserved and retained to secure the unpaid balance of such lender's Allowed Secured Claims.

**II.**
**CONSIDERATIONS IN PREPARATION OF THE DISCLOSURE**
**STATEMENT AND PLAN; DISCLAIMERS**

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE DEBTOR PRESENTLY INTENDS TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING DEADLINE. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN.

*****

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ANTICIPATED EVENTS IN THE BANKRUPTCY CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR CERTAIN DOCUMENTS (AND HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REFER TO THE PLAN AND SPECIFIED DOCUMENTS IN THEIR ENTIRETY AS ATTACHED HERETO), STATUTORY PROVISIONS, EVENTS, OR INFORMATION. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO REVIEW THE ENTIRE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>. IN THE EVENT ANY PROVISION OF THIS DISCLOSURE STATEMENT IS FOUND TO BE INCONSISTENT WITH A PROVISION OF THE PLAN OR THE PLAN DOCUMENTS, THE PROVISION OF THE PLAN OR PLAN DOCUMENTS SHALL CONTROL.**

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF CLAIMS MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTOR AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

\*\*\*\*\*

EXCEPT AS SET FORTH HEREIN, NO PERSON HAS BEEN AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, SUCH SECURITIES TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PLAN WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF, OR SUCH OTHER DATE AS DESCRIBED HEREIN.  ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS DETERMINED BY THE DEBTOR OR ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT, AND AN ESTIMATE SHALL NOT BE CONSTRUED AS AN ADMISSION OF THE AMOUNT OF SUCH CLAIM.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE

HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

## A.    Disclosure Statement; Construction

This Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and is hereby transmitted by the Debtor to holders of Claims and Equity Interests for use in the solicitation of acceptances from the holders of Claims (the "Solicitation") of the Plan, a copy of which is attached hereto as **Exhibit A**. **Unless otherwise defined in this Disclosure Statement, capitalized terms used herein have the meanings ascribed to them in the Plan**.

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, and (iii) article, section and exhibit references are to this Disclosure Statement unless otherwise specified.

The purpose of this Disclosure Statement is to provide "adequate information" to Persons who hold Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan.  By order of the Bankruptcy Court (the "Disclosure Statement Order"), this Disclosure Statement was approved and held to contain adequate information.  A true and correct copy of the Disclosure Statement Order is attached hereto as **Exhibit B**.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.   THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN.  THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE EFFECTUATED.**

## B.    Sources of Information

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtor, its businesses, properties and management, and the Plan have been prepared from information furnished by the Debtor and its property manager, Regis Realty I, LLC. Unless an information source is otherwise noted, the statement was derived from

information provided by such parties. **The Debtor's management or its property manager have prepared financial projections that are attached as exhibits to this Disclosure Statement and a large portion of the assumptions in those financial projections are based solely upon management's industry experience, judgment, and expectations. The assumptions used to derive any of the pro forma operating results are based on the Debtor's historical experience, industry information available to management, and management's experience in owning, operating, and rehabilitating similar properties.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT AND IS BASED, IN PART, UPON INFORMATION PREPARED BY PARTIES OTHER THAN THE DEBTOR. THEREFORE, ALTHOUGH THE DEBTOR HAS MADE EVERY REASONABLE EFFORT TO BE ACCURATE IN ALL MATERIAL MATTERS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT ALL THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE.**

Certain of the materials contained in this Disclosure Statement may have been taken directly from other readily accessible documents or are digests of other documents. While the Debtor has made every effort to retain the meaning of such other documents or portions that have been summarized, the Debtor urges that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall control.

The Debtor has compiled information from the Debtor without professional comment, opinion or verification and does not suggest comprehensive treatment has been given to matters identified herein. Each creditor and holder of an Interest is urged to independently investigate any such matters prior to reliance.

No statements concerning the Debtor, the value of its property, or the value of any benefit offered to the holder of a Claim or Interest in connection with the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be reported to counsel for the Debtor, Melissa S. Hayward, Franklin Skierski Lovall Hayward, LLP, 10501 N. Central Expy, Suite 106, Dallas, Texas 75231, (972) 755-7100.

### III.
### VOTING PROCEDURES

If you are in one of the Classes of Claims whose rights are affected by the Plan (*see* "Summary of the Plan" below), it is important that you vote. **If you fail to vote, your rights may be jeopardized.**

## A. "Voting Claims" -- Parties Entitled to Vote

Pursuant to the provisions of section 1126 of the Bankruptcy Code, holders of Claims or Interests that are (i) <u>allowed,</u> (ii) <u>impaired,</u> and (iii) that are <u>receiving or retaining property on account of such Claims or Interests</u> pursuant to the Plan, are entitled to vote either for or against the Plan (hereinafter, "<u>Voting Claims</u>"). Accordingly, in this Bankruptcy Case, any holder of a Claim classified in Classes 2, 3, 4, 5, 6, 7, 8, or 9 of the Plan may have a Voting Claim and should have received a ballot for voting (with return envelope) with this Disclosure Statement and the Plan materials (hereinafter, "<u>Solicitation Package</u>") since these are the Classes consisting of <u>impaired</u> Claims that are <u>receiving property</u>. Holders of Claims in Non-Class 1 are not entitled to vote. Holders of Claims in Class 10 are not receiving any distribution or property under the Plan and are deemed to have rejected the Plan.

As referenced in the preceding paragraph, a Claim must be <u>allowed</u> to be a Voting Claim. The Debtor filed schedules in this Bankruptcy Case listing Claims against the Debtor. To the extent a creditor's Claim was listed in the Debtor's schedules, and was not listed as disputed, contingent, or unliquidated, it is deemed "allowed". Any creditor whose Claim was not scheduled, or was listed as disputed, contingent or unliquidated, must have timely filed a proof of Claim in order to have an "allowed" Claim. Absent an objection to that proof of Claim, it is deemed "allowed". In the event that any proof of Claim is subject to an objection by the Debtor as of or during the Plan voting period ("<u>Objected-to Claim</u>"), then, by definition, it is not "allowed" for purposes of section 1126 of the Bankruptcy Code, and is not to be considered a Voting Claim entitled to cast a ballot. Nevertheless, pursuant to Bankruptcy Rule 3018(a), the holder of an Objected-to Claim may petition the Bankruptcy Court, after notice and hearing, to allow the Claim temporarily for voting purposes in an amount that the Bankruptcy Court deems proper. Allowance of a Claim for voting purposes, and disallowance for voting purposes, does not necessarily mean that all or a portion of the Claim will be allowed or disallowed for distribution purposes.

**By Enclosing a Ballot, The Debtor Is Not Representing That You Are Entitled To Vote On The Plan.**

## B. Return of Ballots

If you are a holder of a Voting Claim, your vote on the Plan is important. Completed ballots should either be returned in the enclosed envelope or sent to counsel for the Debtor at the following address:

Melissa S. Hayward
Franklin Skierski Lovall Hayward, LLP
10501 N. Central Expy., Suite 106
Dallas, Texas 75231

### 1. Deadline for Submission of Ballots

**Ballots must actually be received at the above address by _____, 2011 at 5:00 P.M. Dallas, Texas Time (The "<u>Voting Deadline</u>"). Any Ballots received after the Voting Deadline will not be counted. Any Ballot that is not executed by a person**

authorized to sign such Ballot will not be counted.  If you have any questions regarding the procedures for voting on the Plan, contact Counsel for the Debtor, Melissa S. Hayward, Franklin Skierski Lovall Hayward, LLP, 10501 N. Central Expy., Suite 106, Dallas, Texas 75231, Telephone (972) 755-7100, Telecopy (972) 755-7110.

THE DEBTOR URGES ALL HOLDERS OF VOTING CLAIMS TO VOTE IN FAVOR OF THE PLAN.

2. **Solicitation of Acceptances**

The Debtor is soliciting your vote.  The cost of any solicitation by the Debtor will be borne by the Debtor.  No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

**NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTOR (INCLUDING, WITHOUT LIMITATION, ITS FUTURE BUSINESS OPERATIONS) OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE THAT ARE OTHER THAN HEREIN CONTAINED SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.**

**THIS IS A SOLICITATION SOLELY BY THE DEBTOR AND IS NOT A SOLICITATION BY ANY SHAREHOLDER, ATTORNEY, OR ACCOUNTANT FOR THE DEBTOR. THE REPRESENTATIONS, IF ANY, MADE HEREIN ARE THOSE OF THE DEBTOR AND NOT OF SUCH SHAREHOLDERS, ATTORNEYS, OR ACCOUNTANTS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation.  This solicitation of votes on the Plan is governed by section 1125(b) of the Bankruptcy Code.  Violation of section 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

The Plan Proponents reserve the right to amend the Plan.  Amendments to the Plan that do not materially and adversely affect the treatment of Claims or Equity Interests may be approved by the Bankruptcy Court at the Confirmation Hearing without the necessity of re-soliciting votes.  In the event re-solicitation is required, the Debtor will furnish new solicitation packets that will include new ballots to be used to vote to accept or reject the Plan, as amended.

3.    **Acceptance by Impaired Classes of Claims.**

An impaired Class of Claims shall have accepted the Plan if (a) the holders (other than any holder designated under Bankruptcy Code § 1126(e)) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders (other than any holder designated under Bankruptcy Code § 1126(e)) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

4.    **Cramdown.**

If each impaired Class of Claims does not accept the Plan, the Plan Proponents request Confirmation of the Plan under Bankruptcy Code § 1129(b).  The Plan Proponents reserve the right to modify the Plan to the extent, if any, that Confirmation pursuant to Bankruptcy Code § 1129(b) requires modification or for any other reason in their discretion, but no such modification may adversely affect PNC (except with PNC's consent).

**C.    The Confirmation Hearing And Objection Deadline**

**THE BANKRUPTCY COURT HAS SET _____, 2011, AT __:__ A.M., CENTRAL TIME, AS THE DATE AND TIME FOR THE HEARING ON CONFIRMATION OF THE PLAN AND TO CONSIDER ANY OBJECTIONS TO THE PLAN.  THE CONFIRMATION HEARING WILL BE HELD AT THE UNITED STATES BANKRUPTCY COURT, JUDGE HALE'S COURTROOM, 1100 COMMERCE, 14TH FLOOR, DALLAS, TEXAS 75242.  THE DEBTOR WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.**

**THE BANKRUPTCY COURT HAS FURTHER FIXED _____, 2011, AT __:__ P.M., CENTRAL TIME, AS THE DEADLINE (THE "OBJECTION DEADLINE") FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN WITH THE BANKRUPTCY COURT.  OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE SERVED SO AS TO BE RECEIVED BY THE FOLLOWING PARTIES ON OR BEFORE THE OBJECTION DEADLINE:**

*Counsel to the Debtor:*

Melissa Hayward
**FRANKLIN SKIERSKI LOVALL HAYWARD LLP**
10501 N. Central Expressway, Suite 106
Dallas, Texas 75231
Tel: 972.755.7100
Fax: 972.755.7110

*Counsel to PNC:*

William L. Wallander
Bradley R. Foxman
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel:  214.220.7700
Fax:  214.220.7716
bwallander@velaw.com; bfoxman@velaw.com

*United States Trustee:*

1100 Commerce Street, Room 976
Dallas, TX  75242
Tel: 214.767.8967
Fax: 214.767.8971

**ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM OR THE NATURE OF ITS EQUITY INTEREST AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

D.      **Recommendation Of Plan Proponents To Approve Plan**

The Debtor approved the solicitation of acceptances of the Plan and all of the transactions contemplated thereunder.  In light of the benefits to be attained by the holders of Claims pursuant to consummation of the transactions contemplated under the Plan, the Debtor recommends that such holders of Claims vote to accept the Plan.  The Debtor has reached this decision after considering the alternatives to the Plan that are available to the Debtor.  These alternatives include liquidation under chapter 7 of the Bankruptcy Code or liquidation under chapter 11 of the Bankruptcy Code with an alternative plan of liquidation.  The Debtor determined, after consulting with its legal advisors, that the transactions contemplated in the Plan would likely result in a distribution of greater value to creditors than would a liquidation under chapter 7.

THE DEBTOR AND PNC SUPPORT THE PLAN, ARE CO-PROPONENTS OF THE PLAN, AND RECOMMEND ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO TIMELY SUBMIT BALLOTS TO ACCEPT THE PLAN.

# IV.
## EXPLANATION OF CHAPTER 11

## A.     Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Pursuant to Chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs for the benefit of the Debtor, its creditors, and other parties-in-interest.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the Debtor in property as of the date the petition is filed.  Unless the Bankruptcy Court orders the appointment of a trustee, sections 1101, 1107 and 1108 of the Bankruptcy Code provide that a Chapter 11 Debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession" as the Debtor has since the Petition Date.

The filing of a Chapter 11 petition also triggers the automatic stay, which is set forth in section 362 of the Bankruptcy Code.  The automatic stay essentially halts all attempts to collect pre-petition claims from the Debtor or to otherwise interfere with the Debtor's business or its estate.

## B.     Purpose of Disclosure Statement

This Disclosure Statement is submitted in accordance with section 1125 of the Bankruptcy Code for the purpose of soliciting acceptances of the Plan from holders of certain Classes of Claims.  The only Creditors whose acceptances of the Plan are sought are those whose Claims are "impaired" by the Plan, as that term is defined by section 1124 of the Bankruptcy Code and who are receiving distributions under the Plan. Holders of Claims that are not "impaired" are deemed to have accepted the Plan.

The Debtor has prepared this Disclosure Statement pursuant to the provisions of section 1125 of the Bankruptcy Code, which requires that a copy of the Plan, or a summary thereof, be submitted to all holders of Claims against, and Interests in, the Debtor, along with a written Disclosure Statement containing adequate information about the Debtor of a kind, and in sufficient detail, as far as is reasonably practicable, that would enable a hypothetical, reasonable investor typical of Creditors and holders of Interests to make an informed judgment in exercising their right to vote on the Plan.

Section 1125 of the Bankruptcy Code provides, in pertinent part:

(b)     An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.  The court may approve a disclosure statement without a valuation of the Debtor or an appraisal of the Debtor's assets.

* * *

(d)     Whether a disclosure statement required under subsection (b) of this section contains adequate information is not governed by any otherwise applicable non-bankruptcy law, rule, or regulation, but an agency or official whose duty is to administer or enforce such a law, rule, or regulation may be heard on the issue of whether a disclosure statement contains adequate information. Such an agency or official may not appeal from, or otherwise seek review of, an order approving a disclosure statement.

(e)     A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the Debtor, of an affiliate participating in a joint plan with the Debtor, or of a newly organized successor to the Debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

**This Disclosure Statement was approved by the Bankruptcy Court during a hearing on _____ ____, 2011**. Such approval is required by the Bankruptcy Code and does not constitute a judgment by the Bankruptcy Court as to the desirability of the Plan, or as to the value or suitability of any consideration offered thereunder. Such approval does indicate, however, that the Bankruptcy Court has determined that the Disclosure Statement meets the requirements of section 1125 of the Bankruptcy Code and contains adequate information to permit the holders of Allowed Claims, whose acceptance of the Plan is solicited, to make an informed judgment regarding acceptance or rejection of the Plan.

## C.     <u>Plan of Reorganization and Confirmation</u>

A plan of reorganization provides the manner in which a Debtor will satisfy the claims of its creditors. After the plan of reorganization has been filed, the holders of claims against or interests in a Debtor are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against or interest in a Debtor vote in favor of a plan of reorganization in order for the plan to be confirmed. At a minimum, however, a plan of reorganization must be accepted by a majority in number and two-thirds in amount of those claims actually voting from at least one class of claims impaired under the plan. The Bankruptcy Code also defines acceptance of a plan of reorganization by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voted.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and, thus, are not entitled to vote. Acceptances of the Plan in this case are being solicited only from those persons who hold Claims in an impaired Class (other than Classes of Claims which are not receiving any distribution under the Plan). A Class is "impaired" if the legal, equitable, or contractual rights attaching to the Claims

or Interests of that Class are modified. Modification does not include curing defaults and reinstating maturity or payment in full in cash.

Even if all classes of claims and interests accept a plan of reorganization, the Bankruptcy Court may nonetheless still deny confirmation. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and, among other things, the Bankruptcy Code requires that a plan of reorganization be in the "best interests" of creditors and shareholders and that the plan of reorganization be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to claimants and interest holders under a plan not be less than the consideration those parties would receive if that Debtor were liquidated under a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code. A plan of reorganization must also be determined to be "feasible", which generally requires a finding that there is a reasonable probability that the Debtor will be able to perform the obligations incurred under the plan of reorganization, and that the Debtor will be able to continue operations without the need for further financial reorganization.

The Bankruptcy Court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and interests accept it. In order for a plan of reorganization to be confirmed despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan of reorganization does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan of reorganization.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of unsecured creditors if, among other things, the plan provides: (a) that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Bankruptcy Court must further find that the economic terms of the plan of reorganization meet the specific requirements of section 1129(b) of the Bankruptcy Code with respect to the particular objecting class. The proponent of the plan of reorganization must also meet all applicable requirements of section 1129(a) of the Bankruptcy Code (except section 1129(a)(8) if the proponent proposes to seek confirmation of the plan under the provisions of section 1129(b)). These requirements include the requirement that the plan comply with applicable provisions of the Bankruptcy Code and other applicable law, that the plan be proposed in good faith, and that at least one impaired class of creditors has voted to accepted the plan.

## V.
## BACKGROUND OF THE DEBTOR

### A.    Nature of the Debtor's Business.

The Debtor is a Nevada corporation with its principal offices located in Dallas, Texas. All of the capital stock of the Debtor is owned by ABC Land & Development, Inc., which is a corporation owned by Ronald Akin and DTS Holdings, LLC. DTS Holdings, LLC is a limited liability company owned by F. Terry Shumate and Donna Shumate. ABC Land & Development,

Inc. acquired all of the capital stock of the Debtor from TCI pursuant to a purchase agreement dated October 22, 2010.

The Debtor's primary assets consist of various real estate holdings in multiple states. Specifically, the Debtor owns: (i) an office building located at 1010 Common St. in New Orleans, LA 70112 (the "1010 Common Property") and various ground leases and land associated with the 1010 Common Property; (ii) approximately 43.433 acres of undeveloped land located at 4600, 5201, 5224, and 5325 Shadydell Circle in Fort Worth, TX (collectively, the "Marine Creek Property"); and (iii) approximately 17.115 acres of undeveloped land located at 11600 Luna Road, Farmers Branch, TX (the "Lacy Longhorn Property"), collectively with the 1010 Common Property and the Marine Creek Property, the "Properties").

With respect to the ground leases and underlying land associated with the 1010 Common Property, the Debtor acquired such ground leases and underlying land from Continental Common Lease Inc. through a purchase agreement dated October 22, 2010 for total consideration in the amount of $2,895,203.00, which sum was paid by the Debtor's assumption of Continental Common Lease Inc.'s outstanding liabilities with respect to the ground leases and underlying land, including any outstanding mortgages and accrued and unpaid rental obligations, and payment of the remainder of the purchase price via a promissory note to TCI. At the time, the ground leases and underlying land associated with the 1010 Common Property that were transferred to the Debtor had a market value of $2,895,203.00. TCI, Continental Common Lease Inc. and the Debtor intended and contemplated that this note be issued to Continental Common Lease Inc. in exchange for the ground leases and the underlying land associated with the 1010 Common Property at the time of the Collateral Transfer; however, due to a scrivener's error at the time of the transaction, the note was erroneously issued to TCI instead of Continental Common Lease Inc.

Likewise, the Debtor acquired the Marine Creek and Lacy Longhorn Properties from TCI through a purchase agreement dated October 22, 2010 for total consideration in the amount of $7,036,416.72, which sum was paid by the Debtor's assumption of TCI's outstanding liabilities with respect to the Marine Creek and Lacy Longhorn Properties, including the outstanding mortgage, and payment of the remainder of the purchase price via a promissory note. At the time, the Marine Creek Property had a market value of $3,727,647.00. At the time, the Lacy Longhorn Property had a market value of $3,308,769.72.

Both before and immediately after the transfer of the Lacey Longhorn Property, the Marine Creek Property, and the ground leases and land associated with the 1010 Common Property to the Debtor, the Debtor had sufficient assets such that the fair value of the assets of the Debtor, at a fair valuation, exceeded its debts and liabilities, subordinated, contingent or otherwise. Accordingly, the notes transferred by the Debtor to TCI and/or Continental Common Lease Inc. in exchange for the Lacy Longhorn Property, the Marine Creek Property, and the ground leases and land associated with the 1010 Common Property, and the assumption of the debt owed to PNC had value and such transfer was for reasonably equivalent value and fair consideration. TCI and Continental Common Lease Inc. made such transfers on reasonable business terms and without actual intent to hinder, delay or defraud any entity.

## B.     The Debtor's Indebtedness and Creditors

With respect to the Properties, as of the Petition Date, the Debtor was indebted to PNC Bank, National Association, as successor-in-interest to National City Bank pursuant to loans made to the Debtor and TCI by National City Bank on or about June 17, 2004 in the original principal amount of $20,000,000.00. The PNC Loans are evidenced by, *inter alia*: (i) a *Promissory Note* dated June 17, 2004 in the original principal sum of $16,250,000.00 executed by the Debtor and payable to National City Bank; (ii) a *Promissory Note* dated June 17, 2004 in the original principal sum of $3,750,000.00 executed by TCI and payable to National City Bank; and (iii) a *Deed of Trust and Security Agreement* by and between TCI and National City Bank dated June 17, 2004. The PNC Loans are secured by various instruments, including a deed of trust and UCC-1 financing statements, which were filed of record in appropriate jurisdictions. Collateral for the PNC Loans includes, *inter alia*, the Properties and rents received from the operation of the Properties.

In addition, as of the Petition Date, the Debtor was indebted to John K. Monlezun in the amount of $225,000 pursuant to a purchase of a tract of land underlying the 1010 Common Property (the "Monlezun Loan"). The Monlezun Loan is evidenced by, *inter alia*: (i) a *Credit Sale* to Continental Mortgage and Equity Trust dated December 28, 1998 and executed by John K. Monlezun; (ii) a *Promissory Note* dated December 28, 1998 in the original principal sum of $225,000.00 executed by TCI and payable to John K. Monlezun; and (iii) an *Act of Mortgage* by and between TCI and John K. Monlezun dated December 28, 1998. The Monlezun Loan is allegedly secured by various instruments, including a deed of trust and UCC-1 financing statements, which were filed of record in appropriate jurisdictions. Collateral for the Monlezun Loan includes a tract of land underlying the 1010 Common Property.

The Debtor's remaining debt is generally comprised of (a) suppliers of goods and services to the Properties, (b) claims of taxing authorities for property and similar taxes, and (c) notes owing to various affiliates associated with the Debtor's purchase of the Properties.

## VI.
## EVENTS LEADING TO BANKRUPTCY FILING
## AND OPERATIONS IN BANKRUPTCY

## A.     The Appointment of a Receiver over the 1010 Common Property

On October 21, PNC obtained the appointment of a receiver in a Louisiana proceeding over the 1010 Common Property. The Debtor filed for bankruptcy protection a few days later on October 28, 2011. Shortly after the Debtor filed for bankruptcy, the Debtor and PNC reached an agreement under which the receiver was relieved of its duties and the Debtor regained control of the 1010 Common Property.

## B.     Filing of the Debtor's Chapter 11 Bankruptcy Case

On October 28, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"). Since the filing of this case, the Debtor has remained in possession of

its property and continued its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Plan Proponents filed the Plan to reorganize the Debtor's financial affairs and hope that the Plan, as it may hereafter be amended, modified, or restated in whole or in part, will be confirmed on a consensual basis through acceptance by all classes of creditors entitled to vote on the Plan. In the event that one or more of the Debtor's creditor classes fails to accept the Plan, the Plan Proponents will ask the Court to confirm the Plan under section 1129(b) of the Bankruptcy Code.

## C.    Acquisition of Properties and of Debtor's stock by Warren Road Farm, Inc.

As discussed in detail above, the Debtor acquired the Marine Creek Property and the Lacey Longhorn Property on or about October 22, 2010. At the same time, ABC Land & Development, Inc. acquired all of the capital stock of the Debtor from TCI pursuant to a purchase agreement also dated October 22, 2010, and since then, the Debtor has been operating as a subsidiary of ABC Land & Development, Inc.

## D.    Pending Litigation

The Debtor is not a party to any pending litigation and is not aware of any claims asserted against it that could result in litigation other than those Claims addressed by the Plan and the Plan Documents.

## E.    Operations of the Debtor during the Pendency of the Case.

The Debtor has continued to operate the Properties during the pendency of the case. Copies of operating reports, which have been filed with the Bankruptcy Court pursuant to Bankruptcy Rule 2015(a)(3), are available from the Bankruptcy Court and/or the U.S. Trustee's office. In addition, the Debtor has entered into stipulated cash collateral agreements in which the Debtor has been granted permission through June 30, 2011 to utilize revenues generated from the Properties to pay for items outlined in the cash collateral budget, subject to adequate protection payments being made to PNC. Copies of the cash collateral stipulations are available from the Clerk of the Bankruptcy Court or, upon request made in writing to Debtor's counsel, Melissa S. Hayward, Franklin Skierski Lovall Hayward LLP, 10501 N. Central Expy., Ste. 106, Dallas, Texas 75231.

On November 5, 2010, the Debtor filed its *Motion to Determine Adequate Assurance of Utility Payments* (the "Utility Motion"). On November 24, 2010, the Bankruptcy Court held a hearing on the Utility Motion. At the hearing, one of the Debtor's utilities, Entergy New Orleans, Inc., appeared and objected to the relief requested in the Utility Motion. At the hearing, the Bankruptcy Court orally granted the Utility Motion, with modifications, and on November 29, 2010, entered an order (the "Utility Order") memorializing its oral ruling of November 24, 2010 granting the Utility Motion. On November 30, 2010, Entergy filed an appeal of the Utility Order to the United States District Court for the Northern District of Texas (the "District Court"), which exercises appellate jurisdiction over final orders entered by the Bankruptcy Court. Among other things, Entergy contended on appeal that the Bankruptcy Court's entry of the Utility Order was an abuse of discretion and in violation of Bankruptcy Code section 366(c), which limits and defines the scope of the Bankruptcy Court's power in ordering "adequate assurance" of utility providers in Chapter 11 bankruptcy cases. The Debtor opposed the appeal and contested

Entergy's contentions that the entry of the Utility Order was an abuse of discretion or in violation of section 366(c). The parties filed competing briefs in the District Court on December 22, 2010 (Entergy) and January 7, 2011 (the Debtor). The District Court did not hold oral argument on the merits of the appeal, but instead, on February 14, 2011, issued an *Order* affirming the Utility Order as modified therein, Docket No. 10 in District Court Case No. 3:10-cv-02591-O (the "Utility Appeal Order"). No party appealed the Utility Appeal Order.

**F.    Professionals Being Paid by the Debtor and Fees to Date**

   1.    **Professionals employed by the Debtor**.

   In the Bankruptcy Case, the Debtor has employed the law firm of Franklin Skierski Lovall Hayward LLP as its Chapter 11 bankruptcy counsel.   The Debtor has also employed McGlinchey Stafford, PLLC as its general lease and collections counsel with respect to the 1010 Common Property.

   2.    **Fees to Date**.

   The Debtor's professionals have not filed fee applications seeking approval of any fees and expenses incurred in this case through the date of this Disclosure Statement.  Prior to the Petition Date, ABC Land & Development, Inc. paid a $40,000 retainer to Franklin Skierski Lovall Hayward LLP, Debtor's general bankruptcy counsel.   The Debtor estimates that the aggregate amount of professional fees and expenses incurred by its professionals through the end of May 2011 total approximately $85,000.00.

**VII.**
**DESCRIPTION OF THE PLAN**

**A.    Introduction**

   A summary of the principal provisions of the Plan and the treatment of Allowed Claims and Interests is set forth in the first part of this Disclosure Statement.

   **THIS SECTION PROVIDES A SUMMARY OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN.  IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND THE PLAN DOCUMENTS (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED HERETO AS EXHIBIT A.**

   THE PLAN ITSELF, THE PLAN DOCUMENTS, AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR, ITS ESTATE, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST.   IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN, THE PLAN DOCUMENTS OR

ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN, THE PLAN DOCUMENTS, AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## B. Designation of Claims and Interests

The following is a designation of the classes of Claims and Interests under the Plan. A Claim or Interest is classified in a particular class only to the extent that the Claim or Interest qualifies within the description of that class and is classified in another class or classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other class or classes. A Claim or Interest is classified in a particular class only to the extent that the Claim or Interest is an Allowed Claim or Allowed Interest in that class and has not been paid, released or otherwise satisfied before the Effective Date; a Claim or Interest which is not an Allowed Claim or Interest is not in any Class. Notwithstanding anything to the contrary contained in the Plan, no distribution shall be made on account of any Claim or Interest which is not an Allowed Claim or Allowed Interest.

| Class | Status |
|---|---|
| Non-Class 1: Allowed Administrative Claims | Non Voting, unimpaired |
| Class 2: Certain Allowed Priority Claims | Impaired – entitled to vote |
| Class 3: Secured Claims of Taxing Authorities | Impaired – entitled to vote |
| Class 4: Secured Claim of PNC | Impaired – entitled to vote |
| Class 5: Secured Claim of Propel | Impaired – entitled to vote |
| Class 6: Secured Claim of John K. Monzelun | Impaired – entitled to vote |
| Class 7: Convenience Claims | Impaired – entitled to vote |
| Class 8: General Unsecured Claims | Impaired – entitled to vote |
| Class 9: Subordinated Claims | Impaired – entitled to vote |
| Class 10: Equity security holder | Impaired – deemed to have rejected |

## C. Treatment of Claims and Interests

A summary outline of the treatment to creditors is set forth below:[1]

| Class - Description | Estimated Number of | Estimated Aggregate Amount of | Proposed Treatment | Amount Required to Fund Initial |
|---|---|---|---|---|

---

[1] The below summary is qualified in its entirety by the Plan and Plan Documents.

| | Claimants Within Class | Allowable Claims* | | Plan Payments |
|---|---|---|---|---|
| **Non-Class 1 – Administrative Claims and Priority Claims (other than Priority Tax Claims, which are treated as Class 2 Claims)** | 2 | $100,000.00 | Each holder of an Allowed Administrative Expense against the Debtor shall receive, at the Reorganized Debtor's option: (i) payment in full in cash on account of such Allowed Administrative Expense without interest within 30 days of the date such Allowed Administrative Expense is Allowed; or (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost, or (iii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor or as ordered by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Reorganized Debtor is authorized to pay in the ordinary course any Administrative Expense representing a liability incurred in the ordinary course of business by the Debtor.

**Allowed Tax Claims entitled to Administrative Expense Priority pursuant to Section 507(a)(8) shall be treated as Class 3 Claims.**

**All outstanding quarterly trustee's fees pursuant to 28 U.S.C. §1930(a)(6) shall be paid by the Reorganized Debtor on the Effective Date and thereafter as the same may become due.**

**Non-Class 1 Claimants shall not be entitled to vote on the Plan.** | $60,000.00 |
| **Non-Class 2 – Certain Allowed Priority Claims** | 0 | $0.00 | Allowed Priority Claims entitled to priority treatment pursuant to Section 507(a)(4) through (a)(7), inclusive, and 507(a)(9) through (a)(10), inclusive shall receive, at the Reorganized Debtor's option: (i) payment in full in cash on account of such Priority Claim without interest in twelve equal monthly payments, the first payment of which will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and on the fifth Business Day of each respective month thereafter; or (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost, or (iii) such other treatment as may be agreed to in writing by such priority Creditor and the Reorganized Debtor or as ordered by the Bankruptcy Court.

**Class 2 Claims are impaired by the Plan.** | $0.00 |
| **Class 3 – Allowed Secured Tax Claims** | 4 | $731,287.00 | Subject to Section 6.4 of the Plan, within ten (10) days of the Effective Date, the Debtor or the Reorganized Debtor (as applicable) shall pay in full the Allowed Secured Claim of any Taxing Authority. Any perfected liens or security interests securing the Allowed Secured Claim of a Taxing Authority will be preserved and continued until such time as the Allowed Secured Claim of a Taxing Authority is paid in full.

**All Tax Claims shall remain subject to section 505 of the Bankruptcy Code. The Reorganized Debtor shall retain the right to a determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code as to any Tax Claim.** | $731,287.00 |

DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF THE JOINT PLAN OF REORGANIZATION DATED JUNE 14, 2011 PAGE 25 OF 61

US 919685v.4

| | | | | |
|---|---|---|---|---|
| | | | The Reorganized Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any objection to any Tax Claim. | |
| | | | With respect to Allowed Secured Tax Claims, the interest rate paid upon such Claims shall be the rate of interest determined under applicable nonbankruptcy law. | |
| | | | Subject to Section 6.4 of the Plan, post-petition property taxes will be paid when such taxes become due and payable under the laws of the applicable taxing jurisdiction unless a particular Property is sold prior to such time, at which time any Allowed Secured Tax Claim with respect to such Property will be paid in full. | |
| | | | Class 3 Claims are impaired by the Plan. | |
| **Class 4 – Allowed Secured Claims of PNC** | **1** | **$17,595,436.39** | Any perfected liens or security interests securing the Allowed Secured Claim of PNC will be preserved and continued until such time as the Allowed Secured Claim of PNC is paid in full in accordance with the provisions of the Plan. The Claims of PNC shall be Allowed in the amount of at least $17,595,436.39 as of the Petition Date, subject to adjustment for, among other things, amounts received by PNC, PNC attorney's fees, interest, and any other amounts as provided in the Plan and the Plan Documents. | **$455,495.00** |
| | | | Continental Common Loan: The maturity of the Continental Common Loan will be extended from June 30, 2010 to December 31, 2012. The Reorganized Debtor will have a twelve month extension option to extend the maturity of the Continental Common Loan to December 31, 2013. Such extension will be at Libor plus 3.50% with a floor of 4.25%. This extension shall be subject to (i) a loan to value ratio of at least 75% as determined by "as-is" appraisals acceptable to PNC in its sole and absolute discretion, (ii) a minimum 1.10x debt service coverage ratio based on a 25 year amortization and a debt constant of the higher of (a) Libor plus 3.50% with a floor of 4.25% or (b) 5%. | |
| | | | The interest rate of the Continental Common Loan will be Libor (as defined in documents evidencing the Continental Common Loan) plus 3.50% based on interest only. | |
| | | | The Debtor or the Reorganized Debtor (as applicable) will pay interest to PNC on the Continental Common Loan at Libor plus 3.50% from July 1, 2010 through the Effective Date less payments previously received by (i) PNC or (ii) the court appointed keeper prior to the Petition Date. The Debtor will continue to pay interest payments of approximately $50,000 per month to PNC in accordance with the approved budget through the Effective Date. | |
| | | | TCI Loan: The maturity of the TCI Loan shall be extended from June 30, 2010 to December 31, 2012. The Reorganized Debtor and TCI will have a twelve month extension option to extend the maturity of the TCI Loan to December 31, 2013. Such extension will be at Libor plus 3.50% with a floor of 4.25%. This extension shall be subject to (i) a loan to value ratio of at least 75% as determined by "as-is" appraisals acceptable to PNC in its sole and | |

| | | | | |
|---|---|---|---|---|
| | | | absolute discretion, (ii) a minimum 1.10x debt service coverage ratio based on a 25 year amortization and a debt constant of the higher of (a) Libor plus 3.50% with a floor of 4.25% or (b) 5%.<br><br>The interest rate of the TCI Loan shall be Libor (as defined in the documents evidencing the TCI Loan) plus 3.50%, interest only, effective June 30, 2010.<br><br>TCI will pay interest to PNC at Libor plus 3.50% from July 1, 2010 through the closing date.<br><br>Class 4 is impaired under the Plan. | |
| **Class 5 – Allowed Secured Claim of Propel Financial Services, LLC** | 1 | $106,583.70 | Except to the extent that Propel agrees to different treatment, the Allowed Secured Claim of Propel shall be paid with monthly cash payments including applicable interest over a period not exceeding five years from the Petition Date. The first payment will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date. The interest rate paid upon the Allowed Secured Claim of Propel shall be the contract rate of 12.50% per annum<br><br>The Allowed Secured Claim of Propel will continue to be secured by its lien and security interest in the Collateral securing the Propel Loan.<br><br>Class 5 is impaired under the Plan. | $2,398.00 |
| **Class 6 – Allowed Secured Claim of John K. Monlezun** | 1 | $225,000.00 | Except to the extent that John Monlezun agrees to different treatment, the Allowed Secured Claim of John Monlezun shall be paid in full within five years of the Effective Date by either the refinancing of the remaining unpaid portion of the Allowed Secured Claim of John Monlezun or the sale of the 1010 Common Property. Until such time as the remaining unpaid portion of the Allowed Secured Claim of John Monlezun is refinanced or otherwise satisfied, which shall occur by no later than sixty (60) months from the Effective Date, the Reorganized Debtor shall make monthly payments to John Monlezun comprised of interest only at the rate of 12% per annum. Mr. Monlezun may also receive from time to time certain payments from the Debtor reducing the outstanding principal amount of the Allowed Secured Claim of John Monlezun as provided in the Plan. The first monthly payment of interest will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and on the fifth Business Day of each respective month thereafter. Any perfected liens or security interests securing the Allowed Secured Claim of John Monlezun will be preserved and continued.<br><br>Class 6 is impaired under the Plan. | $2,250.00 |
| **Class 7 – Convenience Class $2,500 or Less** | 25 | $12,650.53* | Class 7 Claims are comprised of: (i) all Allowed Unsecured Claims that are less than or equal to $2,500.00; and (ii) all Allowed Unsecured Claims held by any Unsecured Creditor electing to have such Claim treated as a Class 7 Claim by waiving the portion of such Claim exceeding the sum of $2,500.00. Class 7 Claims shall be paid 100% of the Allowed amount without interest by the fifth Business Day of the first month that is more than 30 days after the Effective Date through funds to be | $12,650.53 |

| | | | | |
|---|---|---|---|---|
| | | | contributed by TCI. Class 7 Claims are impaired by the Plan. | |
| **Class 8 – All Other Allowed General Unsecured Claims** | 10 | $327,616.92* | Except to the extent that a holder of an Allowed Unsecured Claim agrees to different treatment, Class 8 shall be paid 100% of the Allowed amount without interest in twelve equal monthly payments, the first payment of which will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and on the fifth Business Day of each respective month thereafter. Class 8 Claims are impaired by the Plan. | $27,301.41 |
| **Class 9 – Subordinated Claims of TCI and Continental Common Lease, Inc.** | 1 | $6,423,762.27 | Class 9 Claims will receive, subject to Section 6.4 of the Plan, pro-rata distributions from the Class 9 share of the proceeds from any sale of Property after payment of all Secured Claims holding a Lien in such Property as provided in Article IX. Class 9 Claims may or may not receive distributions under the Plan. Any and all Claims of TCI and Continental Common Lease Inc., of all type and character, shall be subordinate to the Claims of PNC in all respects, and no Distributions shall be made to TCI or Continental Common Lease Inc. until the Claims of PNC are paid in full in all respects. Class 9 Claims are impaired by the Plan. | $0.00 |
| **Class 10 – Allowed Interests** | 1 | **100% Held by ABC Land & Development Inc.** | All Equity Interests Canceled – 100% of New Equity Interests Issued to TCI or its Designee Class 10 Interests are impaired by the Plan | **N/A** |
| **Total** | | | | **$1,291,381.94** |

**\*For purposes of this chart only, Cure Claims are included in the totals for the respective class under which the applicable contract counterparty would be treated if the contract with such counterparty is rejected. Holders of potential Cure Claims should consult Exhibit A of the Plan to determine the amount that the Debtor proposes to pay to such creditor to cure defaults in connection with the assumption of the respective executory contract or unexpired lease.**

1.      **Class 1: Administrative Expense and Certain Priority Claims**.

**Administrative Expenses**. All Administrative Expenses shall be treated as a Non-Class 1 Claim and shall receive the treatment as described below.

1.      Time for Filing Administrative Expenses. The holder of any Administrative Expense Claim, but not including a professional fee claim, a Cure Claim, a liability incurred and paid in the ordinary course of business by the Debtor, or an Administrative Expense previously Allowed by the Bankruptcy Court, must file with the Bankruptcy Court and serve on the Debtor or the Reorganized Debtor (as applicable) and its counsel an application seeking the Allowance of such Administrative Expense within thirty (30) days after the Effective Date. Failure to timely and properly file an application as required herein shall result in the Administrative Expense being forever barred and

discharged.  The Reorganized Debtor shall provide notice to all holders of Claims and Interests of this deadline within five (5) business days of the Effective Date.

2.   Time for Filing Professional Fee Claims.  Each Professional, other than the attorneys and professionals of PNC, who holds or asserts a professional fee claim for compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date shall be required to file with the Bankruptcy Court and serve on all parties required to receive such notice, a fee application within sixty (60) days after the Effective Date. Professional fees and expenses of any Professional incurred on or after the Effective Date may be paid without necessity of application to or Order by the Bankruptcy Court.

3.   Allowance of Administrative Expenses.  An Administrative Expense with respect to which application has been properly filed as provided herein shall become an Allowed Administrative Expense if no objection is filed within thirty (30) days after its filing and service.  If an objection is filed within such thirty (30) day period, the Administrative Expense shall become an Allowed Administrative Expense only to the extent Allowed by a Final Order of the Bankruptcy Court.  An Administrative Expense that is a professional fee claim, and with respect to which a fee application has been properly filed in accordance with the Plan, shall become an Allowed Administrative Expense only to the extent allowed by Final Order of the Bankruptcy Court.

4.   Payment of Allowed Administrative Expenses other than Cure Claims.  Each holder of an Allowed Administrative Expense against the Debtor shall receive, at the Reorganized Debtor's option: (i) payment in full in cash on account of such Allowed Administrative Expense without interest within 30 days of the date such Allowed Administrative Expense is Allowed; or (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost, or (iii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor or as ordered by the Bankruptcy Court.  Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor is authorized to pay in the ordinary course any Administrative Expense representing a liability incurred in the ordinary course of business by the Debtor.

5.   Trustee's Fees.  All outstanding quarterly trustee's fees pursuant to 28 U.S.C. §1930(a)(6) shall be paid by the Reorganized Debtor on the Effective Date and thereafter as the same may become due.

**Allowed Priority Claims: Section 508(a)(8)**.  Allowed Tax Claims entitled to Administrative Expense Priority pursuant to Section 507(a)(8) shall be treated as Class 3 Claims.

**US Trustee Fees**. All outstanding quarterly trustee's fees pursuant to 28 U.S.C. §1930(a)(6) shall be paid by the Reorganized Debtor on the Effective Date and thereafter as the same may become due.

Non-Class 1 Claimants are not a true Class and shall not be entitled to vote on the Plan.

2.   **Class 2: Certain Priority Claims.**  Allowed Priority Claims entitled to priority treatment pursuant to Section 507(a)(4) through (a)(7), inclusive, and 507(a)(9) through (a)(10),

inclusive shall receive, at the Reorganized Debtor's option: (i) payment in full in cash on account of such Priority Claim without interest in twelve equal monthly payments, the first payment of which will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and on the fifth Business Day of each respective month thereafter; or (ii) the amount of such holder's Allowed Claim in accordance with the ordinary business terms of such expense or cost, or (iii) such other treatment as may be agreed to in writing by such priority Creditor and the Reorganized Debtor or as ordered by the Bankruptcy Court. Allowed Tax Claims entitled to priority pursuant to Section 507(a)(8) shall be treated as Class 3 Claims.

Class 2 Claimants are impaired and shall be entitled to vote on the Plan.

3. **Class 3 Claim- Allowed Secured Claims of Taxing Authorities.** Subject to Section 6.4 of the Plan, which provides the treatment being accorded to PNC, within ten (10) days of the Effective Date, the Debtor or the Reorganized Debtor (as applicable) shall pay in full the Allowed Secured Claim of any Taxing Authority. Any perfected liens or security interests securing the Allowed Secured Claim of a Taxing Authority will be preserved and continued until such time as the Allowed Secured Claim of a Taxing Authority is paid in full.

All Tax Claims shall remain subject to section 505 of the Bankruptcy Code. The Reorganized Debtor shall retain the right to a determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code as to any Tax Claim. The Reorganized Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any objection to any Tax Claim.

With respect to Allowed Secured Tax Claims, the interest rate paid upon such Claims shall be the rate of interest determined under applicable nonbankruptcy law.

Subject to Section 6.4 of the Plan, post-petition property taxes will be paid when such taxes become due and payable under the laws of the applicable taxing jurisdiction unless a particular Property is sold prior to such time, at which time any Allowed Secured Tax Claim with respect to such Property will be paid in full.

Subject to Section 6.4 of the Plan, nothing shall prohibit the Debtor or the Reorganized Debtor from selling any of the Properties at any time provided that the remaining unpaid portion of the Allowed Secured Claim of a Taxing Authority holding an interest in such Property being sold shall be paid in full at such time.

Class 3 Claims are impaired by the Plan.

4. **Class 4: Allowed Secured Claim of PNC.** Any perfected liens or security interests securing the Allowed Secured Claim of PNC will be preserved and continued until such time as the Allowed Secured Claim of PNC is paid in full in accordance with the provisions of the Plan. The Claims of PNC shall be Allowed in the amount of at least **$17,595,436.39** as of the Petition Date, subject to adjustment for, among other things, amounts received by PNC, PNC attorney's fees, interest, and any other amounts as provided in the Plan and the Plan Documents.

**Continental Common Loan:** With respect to the Continental Common Loan, the Debtor and PNC will agree upon Plan Documents to modify the Continental Common Loan, structured in

form mutually acceptable to PNC and the Debtor that will be filed prior to the hearing on confirmation of the Plan and will be presented as part of the confirmation process, except to the extent agreed upon in writing by the Debtor and PNC in their respective sole and absolute discretion. Upon confirmation of the Plan, the Continental Common Loan will be modified as follows:

(a)     The maturity of the Continental Common Loan will be extended from June 30, 2010 to December 31, 2012. The Reorganized Debtor will have a twelve month extension option to extend the maturity of the Continental Common Loan to December 31, 2013. Such extension will be at Libor plus 3.50% with a floor of 4.25%. This extension shall be subject to (i) a loan to value ratio of at least 75% as determined by "as-is" appraisals acceptable to PNC in its sole and absolute discretion, (ii) a minimum 1.10x debt service coverage ratio based on a 25 year amortization and a debt constant of the higher of (a) Libor plus 3.50% with a floor of 4.25% or (b) 5%.

(b)     The interest rate of the Continental Common Loan will be Libor (as defined in documents evidencing the Continental Common Loan) plus 3.50% based on interest only.

(c)     The Debtor or the Reorganized Debtor (as applicable) will pay interest to PNC on the Continental Common Loan at Libor plus 3.50% from July 1, 2010 through the Effective Date less payments previously received by (i) PNC or (ii) the court appointed keeper prior to the Petition Date. The Debtor will continue to pay interest payments of approximately $50,000 per month to PNC in accordance with the approved budget through the Effective Date.

(d)     The Debtor or the Reorganized Debtor (as applicable) shall pay all real estate taxes including all penalties and interest currently due; however, the Debtor or the Reorganized Debtor (as applicable) shall have the option of escrowing the amounts due with PNC while such real estate taxes are contested. The Debtor will determine amounts owed to taxing authorities by obtaining payoff amounts directly from the taxing authorities, and evidence of such amounts will be provided to PNC at closing.

(e)     The Debtor and the Reorganized Debtor (as applicable) will establish a monthly real estate tax escrow with PNC for future real estate taxes which will be paid to taxing authorities as such taxes become due.

(f)     The Debtor and the Reorganized Debtor (as applicable) and PNC shall enter into a cash management agreement for the purpose of establishing an account into which all revenues shall be deposited (the "Lockbox"). So long as no event of default of the Continental Common Loan, the TCI Loan, or the Plan shall have occurred, funds in the Lockbox shall be distributed under a waterfall provision (first to interest payment, second to tax escrow, and third to operating expenses subject to an approved budget.) Any excess cash in the Lockbox, as determined by PNC in its sole and absolute discretion, shall be deposited into a leasing

expense/operating expense account held by PNC under a separate agreement (the "Expense Account"). In no event shall such waterfall be considered a consent to subordination of the claims and liens of PNC. Any withdrawals from the Expense Account shall be subject to PNC's approval in its sole and absolute discretion, which approval shall not be unreasonably withheld. Until such time as PNC shall have been paid in full per the terms of the Continental Common Loan documents, no funds in either account shall be used for any expense related to the real property located in Texas that secures the TCI Loan including, without limitation, payment of any principal or interest on any loan secured thereby other than amounts that may be or may become due and owing to PNC, or any taxes associated therewith.

(g) The Debtor or the Reorganized Debtor (as applicable) shall be responsible for any and all leasing and operating expense not covered by funds then available in the Expense Account. Shortfalls may subsequently be recouped as the account is replenished.

(h) The Debtor or the Reorganized Debtor (as applicable) will provide PNC monthly a property operating statement, rent roll, and leasing status report.

**TCI Loan**: With respect to the TCI Loan, the Debtor and PNC will agree upon Plan Documents to modify the TCI Loan, structured in form mutually acceptable to both the Debtor and PNC, that will be filed prior to the Confirmation Hearing and be presented as part of the Plan confirmation process, except to the extent agreed upon in writing by PNC and the Debtor in each of their respective sole and absolute discretion. Upon confirmation of the Plan, the TCI Loan will be modified as follows:

(a) The maturity of the TCI Loan shall be extended from June 30, 2010 to December 31, 2012. The Reorganized Debtor and TCI will have a twelve month extension option to extend the maturity of the TCI Loan to December 31, 2013. Such extension will be at Libor plus 3.50% with a floor of 4.25%. This extension shall be subject to (i) a loan to value ratio of at least 75% as determined by "as-is" appraisals acceptable to PNC in its sole and absolute discretion, (ii) a minimum 1.10x debt service coverage ratio based on a 25 year amortization and a debt constant of the higher of (a) Libor plus 3.50% with a floor of 4.25% or (b) 5%.

(b) The interest rate of the TCI Loan shall be Libor (as defined in the documents evidencing the TCI Loan) plus 3.50%, interest only, effective June 30, 2010.

(c) TCI will pay interest to PNC at Libor plus 3.50% from July 1, 2010 through the closing date.

(d) TCI will pay all real estate taxes due. TCI will determine amounts owed to taxing authorities by obtaining payoff amounts directly from the taxing authorities, and evidence of such amounts will be provided to PNC at closing.

(e) TCI will establish a monthly real estate tax escrow with PNC, which will be paid to taxing authorities as such taxes become due.

(f)     If any property securing the TCI Loan is sold and TCI and the Debtor or the Reorganized Debtor (as applicable) are not in default of the TCI Loan, the Continental Common Loan, the Plan, or the Plan Documents as determined by PNC in its sole and absolute discretion, PNC shall release its lien on its applicable collateral sold promptly at or about the closing of such sale upon the receipt in cash of proceeds of such sale of the greater of (i) $2,600,000 as to the land that secures the TCI Loan that is located in Dallas, Texas and $3,185,000 as to the land that secures the TCI Loan that is located in Fort Worth, Texas, (ii) 100% of the proceeds of such sale, net of closing costs that are approved by PNC in its sole and absolute discretion, which, to the extent that the TCI Loan has been paid in full, shall be applied against the Continental Common Loan, or (iii) provided the Continental Common Loan is paid in full, 100% of the then outstanding principal of the TCI Loan plus all interest and fees thereon.  Once both the TCI Loan and the Continental Common Loan are paid in full and TCI and the Debtor have satisfied all obligations under the Plan and the Plan Documents, any proceeds shall be remitted to the Debtor.

(g)     TCI, the Debtor, and/or the Reorganized Debtor (as applicable)  shall absolutely, irrevocably and unconditionally indemnify and at all times hold harmless PNC from all obligations, losses, damages (whether direct, indirect or consequential), charges, liabilities, claims (legal or equitable), expenses, and suits, of any nature whatsoever, and any and all costs and attorneys' fees incurred in connection therewith, which PNC may suffer, incur, or be subject to as a result of the Collateral Transfer, including, but not limited to, actions brought by or on behalf of TCI, the Debtor, the Reorganized Debtor, Continental Common Lease Inc., or any other Person pursuant to any state or federal fraudulent transfer, fraudulent conveyance, or debtor-creditor statutory or common law including, without limitation, sections 544, 547 or 548 of the Bankruptcy Code (or such successor statutory provision as may provide for a similar remedy) and the Uniform Fraudulent Transfer Act and the Uniform Fraudulent Conveyance Act (as adopted by any state) seeking the avoidance or any attempted avoidance of (a) any transfer of an interest of TCI, Continental Common Lease Inc., the Debtor, and/or the Reorganized Debtor in property or (b) any obligation incurred by TCI, Continental Common Lease Inc., the Debtor, and/or the Reorganized Debtor.

Prior to the confirmation hearing on the Plan, the Debtor shall obtain estoppel letters acceptable to PNC in its sole and absolute discretion as to any leased property which will be part of the Plan Documents.

Upon confirmation of the Plan, the Debtor or the Reorganized Debtor (as applicable) shall pay to PNC in immediately available funds an amount equal to $125,000 for attorney's fees and costs incurred by PNC in connection with the Continental Common Loan, the Transcontinental Loan, and the Bankruptcy Case.

Within 5 days of entry of the Confirmation Order, the Debtor or the Reorganized Debtor (as applicable) and TCI will deposit amounts to be paid to PNC or held in an account at PNC per the terms of the Plan at or prior to closing in either (i) an escrow account with PNC or (ii) a

segregated cash account to be held and not used by the Debtor or the Reorganized Debtor (as applicable).

PNC shall have the right, in its sole and absolute discretion, to demand remediation by the Debtor or the Reorganized Debtor (as applicable) or TCI of any environmental issue that may decrease the value of PNC's collateral that secures the Continental Common Loan or the TCI Loan. The failure of the Debtor or the Reorganized Debtor (as applicable) or TCI to perform such remediation to the extent required by PNC, in PNC's sole and absolute discretion, shall constitute a breach of the Plan and the Plan Documents and shall relieve PNC of all obligations thereunder.

Class 4 is impaired.

5. **Class 5: Allowed Secured Claim of Propel.** Except to the extent that Propel agrees to different treatment, the Allowed Secured Claim of Propel shall be paid with monthly cash payments including applicable interest over a period not exceeding five years from the Petition Date. The first payment will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date. The interest rate paid upon the Allowed Secured Claim of Propel shall be the contract rate of 12.50% per annum.

The Allowed Secured Claim of Propel will continue to be secured by its lien and security interest in the Collateral securing the Propel Loan. Propel shall, upon payment and satisfaction of the Allowed Secured Claim of Propel, execute releases of any remaining encumbrances upon the Lacy Longhorn and/or Marine Creek Properties in a form satisfactory to the Reorganized Debtor and shall deliver same to the Reorganized Debtor or its designee. Subject to Section 6.4 of the Plan, nothing shall prohibit the Reorganized Debtor from refinancing or selling the Lacy Longhorn and/or Marine Creek Properties at any time provided that the remaining unpaid portion of the Allowed Secured Claim of Propel shall be paid in full at such time.

Class 5 is impaired under the Plan.

6. **Class 6: Allowed Secured Claim of John Monlezun.** Except to the extent that John Monlezun agrees to different treatment, the Allowed Secured Claim of John Monlezun shall be paid in full within five years of the Effective Date by either the refinancing of the remaining unpaid portion of the Allowed Secured Claim of John Monlezun or the sale of the 1010 Common Property. Until such time as the remaining unpaid portion of the Allowed Secured Claim of John Monlezun is refinanced or otherwise satisfied, which shall occur by no later than sixty (60) months from the Effective Date, the Reorganized Debtor shall make monthly payments to John Monlezun comprised of interest only at the rate of 12% per annum. Mr. Monlezun may also receive from time to time certain payments from the Debtor reducing the outstanding principal amount of the Allowed Secured Claim of John Monlezun as provided in the Plan. The first monthly payment of interest will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and on the fifth Business Day of each respective month thereafter. Any perfected liens or security interests securing the Allowed Secured Claim of John Monlezun will be preserved and continued. John Monlezun shall, upon payment and satisfaction of the Allowed Secured Claim of John Monlezun, execute releases of any remaining encumbrances upon its Collateral in a form satisfactory to the Reorganized Debtor

and shall deliver same to the Reorganized Debtor or its designee. Subject to Section 6.4 of the Plan, nothing shall prohibit the Reorganized Debtor from refinancing or otherwise disposing of the 1010 Common Property at any time, provided that the remaining unpaid portion of the Allowed Secured Claim of John Monlezun shall be paid in full at such time.

Class 6 is impaired under the Plan.

7.  **Class 7: Convenience Class of Unsecured Claims Less than $2,500.00.** Class 7 Claims are comprised of: (i) all Allowed Unsecured Claims that are less than or equal to $2,500.00; and (ii) all Allowed Unsecured Claims held by any Unsecured Creditor electing to have such Claim treated as a Class 7 Claim by waiving the portion of such Claim exceeding the sum of $2,500.00. Class 7 Claims shall be paid 100% of the Allowed amount without interest by the fifth Business Day of the first month that is more than 30 days after the Effective Date through funds to be contributed by TCI.

Class 7 Claims are impaired by the Plan.

8.  **Class 8: Allowed General Unsecured Claims**. Except to the extent that a holder of an Allowed Unsecured Claim agrees to different treatment, Class 7 Claims shall be paid 100% of the Allowed amount without interest in twelve equal monthly payments, the first payment of which will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and on the fifth Business Day of each respective month thereafter.

Class 8 Claims are impaired by the Plan.

9.  **Class 9: General Unsecured Claims of TCI and Continental Common Lease Inc.** Class 9 Claims will receive, subject to Section 6.4 of the Plan, pro-rata distributions from the Class 9 share of the proceeds from any sale of Property after payment of all Secured Claims holding a Lien in such Property as provided in Article VIII of the Plan. Class 9 Claims may or may not receive distributions under the Plan. Any and all Claims of TCI and Continental Common Lease Inc., of all type and character, shall be subordinate to the Claims of PNC in all respects, and no Distributions shall be made to TCI or Continental Common Lease Inc. until the Claims of PNC are paid in full in all respects.

Class 9 Claims are impaired by the Plan.

10. **Class 10: Interests**. The Class 10 Allowed Interest of the Equity Security Holder shall be cancelled and terminated on the Effective Date.

Class 10 Interests are impaired by the Plan.

D.  **Additional Distributions to Creditors under Article VIII of the Plan**

Article VIII of the Plan provides an additional mechanism by which Creditors may receive additional distributions based upon the Debtor's ability to sell Property. Article VIII of the Plan provides that the Reorganized Debtor will seek to market and sell each of the Properties under the direction of a third party real estate broker, and, subject to Section 6.4 of the Plan, nothing shall prohibit the Debtor or the Reorganized Debtor from refinancing, selling, or

otherwise disposing of any of the Properties at any time, provided that the remaining unpaid portion of any Allowed Secured Claim for which such Property being sold, refinanced, or otherwise disposed of serves as Collateral shall be paid in full at such time and all obligations under the Plan and the Plan Documents of the Debtor, the Reorganized Debtor, and TCI are satisfied in full.

In the event of a sale or refinancing, receipt of insurance loss proceeds or payments, any award or other payment made by any governmental unit or authority in conjunction with the exercise or any right of eminent domain or condemnation, any payments made on account of any easements or access rights granted by the Debtor or the Reorganized Debtor (as applicable), subject to Section 6.4 of the Plan, such proceeds shall first be used to pay in full any Allowed Secured Claim for which such Property serves as Collateral, including the Allowed Secured Claims of PNC and any Taxing Authority holding a Lien in such Property. Upon the full satisfaction of any Allowed Secured Claims holding a Lien in such Property, any remaining proceeds shall be distributed equally among Classes 1 through 9, subject to the subordination of the Claims of TCI and Continental Common Lease Inc. to those of PNC, and provided that no payment shall be made to TCI or Continental Common Lease Inc. until the Claims of PNC are paid in full in all respects, but with respect to each such Class, only to the extent that Claims within such Class remain unsatisfied at such time.

## E.   Funding and Manner of Distribution of Property under the Plan

1.   **Funding of Plan.** Subject to Section 6.4 of the Plan, the Reorganized Debtor will use Net Cash Flow, funds received from TCI, funds on deposit in the Debtor's various debtor-in-possession bank accounts, including, but not limited to, the tax escrow account and the $96,000.00 deposited by the Debtor into a special utility escrow account for the benefit of Entergy New Orleans, Inc., who has received a surety bond executed by TCI as adequate assurance of payment and in such funds' stead, collections of accounts receivable owed as of the Confirmation Date, funding from TCI, its designee, or any other entity, proceeds from sales or refinancing of the Properties, and any additional monies obtained by the Debtor to fund the Distributions required under the Plan to Classes 1, 2, 3, 5, 6, 7, 8, and 9.

Distributions to Class 4 shall be treated in accordance with Section 6.4 of the Plan and will be funded by Gross Revenue, funds received from TCI, its designee, or any other entity, (either as capital contributions or in accordance with the obligations of TCI under the Plan Documents), funds on deposit in the Debtor's various debtor-in-possession bank accounts, including, but not limited to, the tax escrow account and the $96,000.00 deposited by the Debtor into a special utility escrow account for the benefit of Entergy New Orleans, Inc., collections of accounts receivable owed as of the Confirmation Date, insurance loss proceeds or payments, any award or other payment made by any governmental unit or authority in conjunction with the exercise or any right of eminent domain or condemnation, any proceeds from any sale, refinancing, exchange, or other disposition of the Properties, any payments made on account of any easements or access rights granted by the Debtor which are not material to the operation of the Property, and any additional monies obtained by the Debtor.

2.   **Distribution Procedures and Distribution Agent.** Except as otherwise provided in the Plan, all distributions of Cash and other property shall be made by the Reorganized

Debtor's Distribution Agent on the later of the Effective Date or the Allowance Date, or as soon thereafter as practicable. Distributions required to be made on a particular date shall be deemed to have been made on such date if actually made on such date or as soon thereafter as practicable. No payments or other distributions of property shall be made on account of any Claim or portion thereof unless and until such Claim or portion thereof is Allowed.

The Debtor proposes to use Brett Nickel, an officer of Debtor's property manager, Regis Realty I, LLC, 1800 Valley View Lane, Suite 200, Dallas, Texas 75234, as the Distribution Agent under the Plan. Mr. Nickel has agreed to serve as Distribution Agent and will not receive any compensation from Debtor or Reorganized Debtor for serving as Distribution Agent under the Plan. Regis Realty I, LLC will not receive any compensation from the Debtor or the Reorganized Debtor on account of Mr. Nickel's serving as Distribution Agent, although it will continue to be compensated for managing the Properties under its management agreement with the Debtor, which will be assumed under the Plan. If any party in interest objects to Mr. Nickel serving as Distribution Agent under the Confirmed Plan, and if the Debtor and such objecting party cannot agree to a substitute Distribution Agent or the compensation or other terms of such agent's engagement, the Debtor will file a motion or take other appropriate action to have a Distribution Agent and the terms of such agent's engagement appointed and approved by the Court.

The Distribution Agent shall place all funds provided by TCI or its designee for making Plan payments into the Distribution Account and is authorized, provided there are sufficient funds available in said account, to make Distributions from the Distribution Account. The Distribution Agent will serve until all Distributions required under the Plan have been made, whereupon the Distribution Account will be closed, and no further actions are required to consummate the Plan. All documents, writings, authorizations or matters requiring the consent of, execution by, or signature of the Debtor or Reorganized Debtor (as applicable) may be consented to, executed by, or signed by the Distribution Agent, whose signature, execution, or consent is hereby deemed authorized, enforceable and binding without further order of the Court. A certified copy of the Confirmation Order may be filed in any deed record, government or public record keeping place as authentication of the signature and authority of the Distribution Agent to consent to, execute, or sign any writing or document of the Debtor and Reorganized Debtor (as applicable) herein.

3.     **Disputed Claims or Interests.**  Notwithstanding any other provision of the Plan, any Claim or Interest which is disputed, unliquidated, or contingent as of any date on which a Distribution is to be made shall not participate in or otherwise receive any such Distribution until a Final Order has been entered allowing such Claim or Interest.

4.     **Manner of Payment under the Plan.**  Cash payments made pursuant to the Plan shall be in U.S. dollars by checks drawn on a domestic bank selected by the Reorganized Debtor, or by wire transfer from a domestic bank, at the Reorganized Debtor's option.

5.     **Compliance with Tax Requirements**.  The Debtor or the Reorganized Debtor (as applicable) shall comply with all withholding and reporting requirements imposed by federal, state, and local taxing authorities and any distributions hereunder shall be subject to such requirements, if any.

**F.**    **Treatment of Executory Contracts and Unexpired Leases.**

      1.    **Motion to Assume.** The Plan shall constitute a motion to assume the executory contracts and unexpired leases listed in Exhibit A attached to the Plan and the vesting of such contracts in the Reorganized Debtor as of the Effective Date. All executory contracts and unexpired leases not listed on Exhibit A attached to the Plan shall be rejected on the Effective Date. Except as otherwise set by Order of the Bankruptcy Court, any objection to the assumption and vesting of, or the proposed cure amount under, the executory contracts and unexpired leases listed in Exhibit A attached to the Plan must be made as an objection to confirmation of the Plan. If no objection to the assumption and vesting of, or the proposed cure amount under, any particular executory contract and unexpired lease listed on Exhibit A attached to the Plan and timely served, an Order (which may be Confirmation Order) that approves the assumption and vesting of, and the proposed cure amount under, each respective executory contract and unexpired lease listed on Exhibit A attached to the Plan may be entered by the Bankruptcy Court. If any such objections are filed and timely served, a hearing with respect to the assumption and vesting or cure of any of executory contract and unexpired lease listed on Exhibit A attached to the Plan, and the objections thereto, shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

      2.    **Notice of Assumption.** On or as soon as reasonably practicable after the entry of the order approving the Disclosure Statement, the Debtor shall serve a notice to parties to the executory contracts and unexpired leases listed on Exhibit A attached to the Plan whose agreements may be assumed by the Debtor and vested in the Reorganized Debtor under the Plan. That notice shall include the proposed cure payment to be paid to the non-Debtor parties or any other third parties necessary to cure all defaults and arrearages under the executory contracts and unexpired leases listed on Exhibit A attached to the Plan and the means by which such parties may receive information regarding the providing of adequate assurance.

      3.    **Effect of Assumption.** If the Bankruptcy Court approves the assumption and vesting of one or more executory contracts and unexpired leases listed on Exhibit A attached to the Plan, each executory contract and unexpired lease listed on Exhibit A attached to the Plan shall be deemed an assumed contract, and such contracts shall be assumed by the Debtor effective as of the Effective Date, and they shall vest in the Reorganized Debtor on the Effective Date. In the event of a dispute concerning the assumption of an executory contract and unexpired lease listed on Exhibit A attached to the Plan, the dispute shall be resolved by the Bankruptcy Court. To the extent that a counterparty to an executory contract or unexpired lease has Claims that are not set forth on Exhibit A that relate to the executory contracts and unexpired leases set forth on Exhibit A of the Plan, as of the Effective Date such counterparty shall be barred from asserting such Claims.

      4.    **Cure Claims.** Any Cure Claim owed under any assumed executory contract or lease will be paid by the Reorganized Debtor in the amount set forth in Exhibit A of the Plan through twelve equal monthly payments, the first of which will be due and payable on the fifth Business Day of the first month that is more than 30 days after the Effective Date and the remainder of which will be due on the fifth Business Day of each respective month thereafter.

## G.  Treatment of Tenant Security Deposits.

The Debtor or the Reorganized Debtor (as applicable) shall continue to hold any and all security deposits tendered to the Debtor by any tenant at the 1010 Common Property in a segregated escrow account and shall maintain such deposits in accordance with the terms of the respective office lease.

## H.  Means for Execution and Implementation of the Plan

1. **TCI's Financial Contributions**.  On the Effective Date, and at such times as are necessary thereafter, TCI or its designee will contribute to the Reorganized Debtor sufficient funds to enable the Reorganized Debtor to make the payments and distributions to Creditors under the Plan and to continue operations of the Properties. The Debtor estimates that within thirty days of the Effective Date, TCI or its designee will be required to fund approximately $255,000.00 on account of such payments and expenses.  **Prior to the Confirmation Hearing, TCI or its designee will create and deposit into a restricted, segregated special-purpose account at Colonial Bank, 8144 Walnut Hill Lane, Suite 160, Dallas, Texas, $255,000.00 to secure its commitment to fund the initial plan payments in addition to the obligations created by Section 6.4 of the Plan.  Post-confirmation, TCI or its designee will at all times maintain sufficient funds in such account to pay obligations under the Plan estimated to be due in the following month.**

TCI is a public corporation, and as such, its financial statements are generally available to the public.  TCI has more than sufficient assets, funds, lines of credit, and other financial resources to fund the payment requirements of the Plan. Notwithstanding, TCI or its designee will fund the initial $255,000.00 to secure its commitment to fund the initial plan payments prior to the Confirmation Hearing and will provide the Debtor with a commitment letter for remaining potential commitment under the Debtor's Plan.

2. **Board of Directors of the Reorganized Debtor**.  The board of directors of Reorganized Debtor shall be:

Daniel J. Moos
Gene S. Bertcher

3. **Post-Confirmation Management**.  The officers of Reorganized Debtor shall be:

Daniel J. Moos – President
Gene S. Bertcher – Vice President/Treasurer
Louis J. Corna – Vice President/Secretary
Steven A. Shelley – Vice President
Melody A. Wofford – Assistant Secretary

The Debtor's and the Reorganized Debtor's officers and directors do not and will not receive any salaries or compensation from the Debtor and/or the Reorganized Debtor for such employment and offices. On the Effective Date, the Reorganized Debtor shall be authorized and directed to take all necessary and appropriate actions to effectuate the transactions contemplated by the Plan and the Disclosure Statement.

4.     **Rescission of Continental Common Lease Note.**  The Plan Documents shall include, and the Plan shall ratify and effectuate in connection with the Plan Documents, (a) a rescission of the Continental Common Lease Note and (b) the issuance of a corrected note payable to Continental Common Lease Inc. effective as of the date of the Collateral Transfer.

5.     **Preservation of Causes of Action**.

(a)     **Litigation Not Yet Commenced**.

The Plan preserves all causes of action, unless expressly otherwise released, and provides for them to be transferred to the Reorganized Debtor on the Effective Date of the Plan.  The causes of action include certain avoidance actions and other claims that the Debtor holds against third parties.  The Estates hold the following causes of action, among others, all of which shall be preserved and transferred to the Reorganized Debtor (unless expressly otherwise released by the Plan):

(b)     **Preferences, Fraudulent Transfers and Other Avoidance Actions**.

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety days immediately prior to the filing of its bankruptcy petition with respect to preexisting debts to the extent the transferee received more than it would have in respect of the preexisting debt had the transferee not received the payment and had the debtor been liquidated under chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

Transfers made in the ordinary course of the debtor's and the transferee's business according to their ordinary business terms are generally not recoverable.  Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a preferential transfer were recovered by the debtor, the transferee would have a general unsecured claim against the debtor to the extent of the debtor's recovery.

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover certain prepetition transfers of property, including the grant of a security interest in property, made while insolvent to the extent the debtor receives less than fair value for such property.  In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property.  As of the date hereof, the Debtor has not yet estimated the potential recovery from the prosecution of their avoidance actions.  Under the Plan, all such avoidance actions are preserved and transferred to the Reorganized Debtor, and the Reorganized Debtor will have the authority to investigate and prosecute all such avoidance actions in accordance with section 1123(b)(3) of the Bankruptcy Code.

During the ninety (90) days prior to the Petition Date, the Debtor directly or indirectly made payments and other transfers to creditors on account of antecedent debts.  The Debtor believes that most, if not all, of those payments were made either to secured creditors whose collateral exceeded the amount of such creditors' claims or to unsecured creditors in the ordinary

course of the Debtor's business from funds provided by TCI or other parties. Therefore, Plan the Debtor does not believe that such payments are subject to avoidance and recovery by the Debtor's estates as preferential transfers pursuant to Sections 547 and 550 of the Bankruptcy Code.

Additionally, in the year prior to the Petition Date while TCI was the parent of the Debtor, TCI received no less than $1,539,994.74 from the Debtor as a result of a general cash management system in place between TCI and its subsidiaries. In operating as the parent corporation over myriad other corporations, in the normal course of TCI's and its subsidiaries' business, the revenue from TCI's various subsidiaries flows upstream into a controlled operating account owned by TCI. From this account, TCI transfers funds to a separate controlled disbursement account owned by the particular subsidiary to pay such subsidiary's operating expenses each month. Thus, each month, the 1010 Common Property's revenue would flow upstream from the Debtor into TCI's controlled operating account, and the monthly operating expenses associated with the 1010 Common Property would thereafter be paid from checks drawn from separate controlled disbursement accounts owned by the Debtor and funded by TCI. The Reorganized Debtor will have discretion regarding whether or not to pursue TCI for causes of action related to these transfers.

(c) **Other causes of action**.

(1) **Investigation of causes of action**.

The Reorganized Debtor will continue the investigation, analysis, and pursuit[2] of causes of action against a number of persons, relating to, among other things, the following:

- Any lawsuits for, or in any way involving, the collection of accounts receivable;

- Any actions against lessees, sublessees, or assignees arising from various leases, subleases, and assignment agreements relating thereto, including, but not limited to, actions for overcharges relating to taxes, common area maintenance and other similar charges;

- Any litigation or lawsuit initiated by the Debtor that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association, or any other court or tribunal;

- Any and all causes of action against any customer or vendor who has improperly asserted or taken action through setoff or recoupment; and

- Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtor's business operations.

---

[2] Pursuit of such claim or cause of action may include, but not be limited to, service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Reorganized Debtor to obtain a resolution of such claim or cause of action.

In addition, there may be numerous other causes of action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such causes of action are based are not fully or currently known by the Debtor and as a result, cannot be raised during the pendency of the Bankruptcy Case (collectively, "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Reorganized Debtor to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtor or the Reorganized Debtor (as applicable). The Reorganized Debtor will pursue unknown causes of action to the extent they become known in its discretion.

(2)      **<u>Preservation of All causes of action Not Expressly Settled or Released</u>**.

The Debtor has attempted to disclose herein certain material causes of action including avoidance actions and other actions that they may hold against third parties. However, the Debtor has not concluded the investigation and analysis of all potential claims and causes of action against third parties. It is the contemplation of the Plan, that such investigation and analysis will continue post-Confirmation by the Reorganized Debtor. You should not rely on the omission of the disclosure of a claim or cause of action to assume that the Debtor holds no claim or cause of action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot.

**Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims or causes of action against third parties are specifically reserved and will vest in or be transferred to the Reorganized Debtor, including but not limited to any such claims or causes of action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignments of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt recharacterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

Unless expressly released by the Plan or by an order of the Bankruptcy Court, the Debtor holds claims against holders of Claims or Equity Interests and the Reorganized Debtor may

**DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF THE JOINT PLAN OF REORGANIZATION DATED JUNE 14, 2011**           **PAGE 42 OF 61**

US 919685v.4

pursue such claims, including but not limited to, the following claims and causes of action, all of which shall be preserved for the benefit of the Reorganized Debtor: [3]

- Preference claims under section 547 of the Bankruptcy Code;

- Fraudulent transfer and other avoidance claims arising under sections 506, 542 through 551, and 553 of the Bankruptcy Code and various state laws, including, but not limited, to claims against any recipients of transfers included in the Debtor's Statements of Financial Affairs;

- Unauthorized post-petition transfer claims including, without limitation, claims under section 549 of the Bankruptcy Code;

- Claims and causes of action asserted in current litigation, whether commenced pre- or post-petition, including all litigation referenced in the Debtor's Statements of Financial Affairs;

- Counterclaims asserted in current litigation;

- Litigation in the future with respect to various of the commercial office leases in order to enforce the terms of such leases, pursue future or past defaults under such leases, and/or evict tenants for non-payment of rent. As such, the Debtor retains all causes of action and claims with respect to its commercial office leases and any tenant of the 1010 Common Building in the Plan; and

- Actions against any taxing authority with respect to the contest of any taxes assessed against any of the Properties.

The Reorganized Debtor may pursue all defendants described in this Disclosure Statement for all claims and causes of action described herein that are not resolved by the Debtor prior to the Effective Date. Pursuit of a claim or cause of action may include, but not be limited to, service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Reorganized Debtor to obtain a resolution of such claim or cause of action. In the event the Reorganized Debtor is not able to resolve any claims and causes of action described in the Disclosure Statement, the Reorganized Debtor will escalate its pursuit of claims and causes of action by any means authorized under the Plan, Disclosure Statement, and applicable law, including litigation in such forum as the Reorganized Debtor deems appropriate. Resolution of the claims and causes of action described in this Disclosure Statement by the Reorganized Debtor shall be in accordance with the requirements and procedures set forth in the Plan.

Except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, the Reorganized Debtor shall be transferred all causes of action, and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of

---

[3] Pursuit of a claim or cause of action may include, but not be limited to, service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Reorganized Debtor to obtain a resolution of such claim or cause of action.

the causes of action. Except as otherwise ordered by the Bankruptcy Court or expressly released in the Plan, the Reorganized Debtor shall be vested with authority and standing to prosecute any causes of action.

The Debtor's failure to identify a claim or cause of action herein is specifically not a waiver of any claim or cause of action. The Debtor will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any cause of action or the value of the entirety of the Estate at the Confirmation Hearing; accordingly, except claims or causes of action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtor's failure to identify a claim or cause of action herein shall not give rise to any defense of any preclusion doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or causes of action which could be asserted against third parties, including holders of Claims against or Equity Interests in the Debtor who may be reading this Disclosure Statement and/or casting a Ballot, except where such claims or causes of action have been explicitly released in the Plan or the Confirmation Order.

In addition, the Debtor and the Reorganized Debtor expressly reserve the right to pursue or adopt any claim alleged in any lawsuit in which the Debtor is a party.

**PLEASE TAKE NOTICE THAT, WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTOR AND ITS ESTATE, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE REORGANIZED DEBTOR PURSUANT TO THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, AS THE DEBTOR INTENDS FOR THE PLAN TO PRESERVE AND TRANSFER TO THE REORGANIZED DEBTOR ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTOR AND ITS ESTATE AS OF THE EFFECTIVE DATE OF THE PLAN.**

## I. <u>Objections to Claims.</u>

1. <u>Time for Filing Claims</u>. All claimants (except for Creditors whose Claims are included in Non-Class 1 or whose Claims were scheduled as undisputed, liquidated, and noncontingent in the Schedules) shall be required to file a Proof of Claim prior to the Bar Date in order to participate in any Distribution made under the Plan or to have such Claim allowed by the Bankruptcy Court. Any Claim asserted pursuant to Section 507(a)(1), other than Claims made pursuant to Section 330 of the Bankruptcy Code, shall be filed within ten (10) days prior to the first date scheduled by the Bankruptcy Court for commencement of the hearing to be held on the Confirmation of the Plan.

2. <u>Objection Deadline</u>. All objections to Claims shall be served and filed by the Objection Deadline, if one is set by the Bankruptcy Court, although nothing contained in the Plan shall require the fixing of an Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register. If an Objection

Deadline is fixed, it may be extended one or more times by the Bankruptcy Court pursuant to a motion filed on or before the then applicable Objection Deadline. Any Contested Claims may be litigated to Final Order.

3.      Distributions on Account of Contested Claims.  No distribution shall be made on account of a Contested Claim until Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

4.      No Waiver of Right to Object.  Except as expressly provided in the Plan, nothing contained in the Disclosure Statement, the Plan, or the Confirmation Order shall waive, relinquish, release or impair the Reorganized Debtor's right to object to any Claim that has not yet been Allowed.

5.      Rights Under Section 505.  All Tax Claims shall remain subject to section 505 of the Bankruptcy Code.  The Reorganized Debtor shall retain the right to a determination of the amount or legality of any tax pursuant to section 505 of the Bankruptcy Code as to any Tax Claim.  The Reorganized Debtor may seek relief pursuant to section 505 of the Bankruptcy Code as a part of, and in conjunction with, any objection to any Tax Claim.

6.      Allowance of Contested Claims.  Nothing contained in the Plan, Disclosure Statement, or Confirmation Order shall change, waive or alter any requirement under applicable law that the holder of a Contested Claim must file a timely proof of Claim, and the Claim of any such Contested Creditor who is required to file a proof of Claim and fails to do so shall be discharged and shall receive no distribution through the Plan.  The holder of any Contested Claim shall not have a right to trial by jury before the Bankruptcy Court in respect of any such Claim.  Exclusive venue for any Contested Proceeding shall be in the Bankruptcy Court or a court of competent jurisdiction located in Dallas County, Texas.  Contested Claims shall each be determined separately, except as otherwise ordered by the Bankruptcy Court.  Texas Rule of Civil Procedure 42 and Federal Rule of Civil Procedure 23 shall not apply to any Contested Proceeding.  The Reorganized Debtor shall retain all rights of removal to federal court as to any Contested Proceeding.

7.      Allowance of Certain Claims.  All Contested Claims shall be liquidated and determined as follows:

(a)     Application of Adversary Proceeding Rules.  Unless otherwise ordered by the Bankruptcy Court or provided by the Bankruptcy Rules, any objection to a Contested Claim shall be treated as a contested proceeding subject to Bankruptcy Rule 9014 of the Rules of Bankruptcy Procedure.  However, any party may move the Bankruptcy Court to apply the rules applicable to adversary proceedings to any Claim Objection.  The Reorganized Debtor, however, may at its election, make and pursue any Objection to a Claim in the form of an adversary proceeding.

(b)     Scheduling Order.  Unless otherwise ordered by the Bankruptcy Court, or if the Objection is pursued as an adversary proceeding, a scheduling order shall be entered as to

each Objection to a Claim. The Debtor shall tender a proposed scheduling order with each Objection and include a request for a scheduling conference for the entry of a scheduling order. The scheduling order may include (i) discovery cut-off, (ii) deadlines to amend pleadings, (iii) deadlines for designation of and objections to experts, (iv) deadlines to exchange exhibit and witness lists and for objections to the same, and (v) such other matters as may be appropriate.

8. <u>Substantial Consummation.</u> All distributions of any kind made to any of the Creditors after substantial consummation and any and all other actions taken under the Plan after substantial consummation shall not be subject to relief, reversal, or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8005.

## J. <u>Conditions to Effectiveness of the Plan.</u>

Each of the following events shall occur on or before the Effective Date; provided, however, the Plan Proponents may waive in writing any of the following event, in each Plan Proponent's sole and absolute discretion, whereupon the Effective Date shall occur without further action by any Person:

a. the Confirmation Order, in a form and substance reasonably acceptable to each of the Plan Proponents, shall have been entered by the Bankruptcy Court and shall not be subject to a stay and shall include one or more findings that (i) the Plan is confirmed with respect to the Debtor, (ii) the Debtor has acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code as set forth in Bankruptcy Code § 1125(e), and (iii) the Debtor is authorized to take all actions and consummate all transactions contemplated under the Plan;

b. the Bankruptcy Court shall have approved the termination and extinguishment of the equity Interests in the Debtor and the equity interests of the Reorganized Debtor have been issued to TCI;

c. the Bankruptcy Court shall have determined that the Reorganized Debtor is or will be duly authorized to take the actions contemplated in the Plan and the Plan Documents, which approval and authorization may be set forth in the Confirmation Order;

d. all documents, instruments, and agreements provided under, or necessary to implement, the Plan, including, but not limited to, the Plan Documents, shall have been executed and delivered by the applicable parties;

e. the Plan Documents, each in form and substance reasonably acceptable to the Plan Proponents and the parties thereto, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived;

f. the Bankruptcy Court shall have found that the aggregate allowance of all Administrative Claims will be less than or equal to $125,000 on or before the hearing on the Disclosure Statement;

g.      no Material Adverse Change (as defined below) shall have occurred. As used herein, "Material Adverse Change" shall mean a change in the asset value, business operations or financial condition of the Debtor which materially and adversely diminishes the value of the assets owned by the Debtor.  Any dispute regarding whether a Material Adverse Change has occurred shall be determined by the Bankruptcy Court;

h.      PNC shall have received estoppel letters obtained by the Debtor that are acceptable to PNC in PNC's sole and absolute discretion as to any lease property;

i.      the Confirmation Order shall contain a finding acceptable to PNC in its sole and absolute discretion that (1) both before and immediately after the consummation of the Collateral Transfer, the Debtor had sufficient assets such that the fair value of the assets of the Debtor, at a fair valuation, exceeded its debts and liabilities, subordinated, contingent or otherwise; (2) the transfer of notes from the Debtor to TCI and Continental Common Lease Inc. in the amounts thereof and the assumption of the PNC Loan by the Debtor constituted reasonably equivalent value and fair consideration for the Collateral Transfer; and (3) the Collateral Transfer was made on reasonable business terms and was not made with actual intent to hinder, delay or defraud any entity;

j.      the Confirmation Order shall contain a finding acceptable to PNC in its sole and absolute discretion that (a) TCI, Continental Common Lease Inc. and the Debtor intended and contemplated that the Continental Common Lease Note be issued to Continental Common Lease Inc. in exchange for the Collateral Transfer at the time of the Collateral Transfer, (b) the rescission of the Continental Common Lease Note and reissuance of a corrected note to Continental Common Lease Inc. to be effectuated by the Plan and the Plan Documents is necessary to correct a scrivener's error at the time of the transaction, and (c) the rescission of the Continental Common Lease Note and reissuance of the corrected note is valid, binding, and enforceable as of the date of the Collateral Transfer; and

k.      the Bankruptcy Court shall have approved the Plan Documents.

## K.      Effects of Plan Confirmation.

1.      **Discharge**.  Except to the extent provided in the Plan, the Plan Documents and the Confirmation Order, on the Effective Date, the Debtor, its estate, the Reorganized Debtor and their respective assets and properties are automatically and forever discharged and released from all Claims and vested free and clear of all Liens to the fullest extent permitted under Bankruptcy Code § 1141.  Except as otherwise set forth in the Plan, the Plan Documents, or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and equity Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on any Claims from the Petition Date against the Debtor, the estate and the Reorganized Debtor, and the termination and cancellation of all equity Interests. Except as set forth in the Plan, the Plan Documents, or the Confirmation Order, Confirmation shall (a) discharge the Debtor and the Reorganized Debtor from all Claims or other debts that

arose before the Effective Date, and all debts of a kind specified in Bankruptcy Code §§ 502(g), (h), or (i), whether or not (i) a Proof of Claim based on such debt is Filed or deemed filed under Bankruptcy Code § 501, (ii) a Claim based on such debt is Allowed, or (iii) the holder of a Claim based on holders of such debt has accepted the Plan, and (b) terminate all equity Interests and other rights of equity Interests in the Debtor.

2. **Legal Binding Effect**.  The provisions of the Plan shall bind all holders of Claims and equity Interests and their respective successors and assigns, whether or not they accept the Plan.  On and after the Effective Date, except as expressly provided in the Plan and the Plan Documents, all holders of Claims, Liens and equity Interests shall be precluded from asserting any Claim, cause of action or Liens against the Debtor, the estate, the Reorganized Debtor or their respective property and assets based on any act, omission, event, transaction or other activity of any kind that occurred or came into existence prior to the Effective Date.

3. **Moratorium, Injunction and Limitation of Recourse For Payment.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE PLAN DOCUMENTS, OR BY SUBSEQUENT ORDER OF THE BANKRUPTCY COURT, UPON CONFIRMATION OF THE PLAN (AND FROM AND AFTER THE EFFECTIVE DATE) ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR LIENS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR OR ITS PROPERTIES ARE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE ESTATE, THE DEBTOR, AND THE REORGANIZED DEBTOR: (A) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION OR OTHER PROCEEDING; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING IN ANY MANNER ANY JUDGMENT, AWARD, DECREE OR ORDER; (C) CREATING, PERFECTING OR ENFORCING ANY LIEN OR ENCUMBRANCE; (D) ASSERTING A SETOFF, RIGHT OF SUBROGATION, NETTING OR RECOUPMENT; AND (E) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN AND THE PLAN DOCUMENTS; <u>PROVIDED, HOWEVER</u>, THAT NOTHING CONTAINED HEREIN OR IN THE CONFIRMATION ORDER SHALL ENJOIN OR PRECLUDE (A) SUCH PERSONS FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN AND THE PLAN DOCUMENTS; AND (B) THE REORGANIZED DEBTOR IN ANY MANNER FROM ENFORCING OR EXERCISING ITS RIGHTS OR REMEDIES PURSUANT TO OR ARISING OUT OF THE PLAN, THE CONFIRMATION ORDER, OR THE PLAN DOCUMENTS. SUCH INJUNCTION SHALL EXTEND TO AND FOR THE BENEFIT OF ANY SUCCESSOR OR ASSIGNEE OF THE DEBTOR, THE REORGANIZED DEBTOR, AND THEIR RESPECTIVE PROPERTIES AND INTEREST IN PROPERTIES.  SUCH INJUNCTION SHALL NOT PRECLUDE ANY RIGHT OF AN ENTITY TO ASSERT A SEPARATE AND DIRECT CLAIM THAT IS NOT PROPERTY OF THE ESTATE AGAINST A PARTY THAT IS NOT THE DEBTOR OR THE REORGANIZED DEBTOR.  THE CONFIRMATION ORDER SHALL, AMONG OTHER THINGS, CONTAIN, DIRECT AND PROVIDE FOR THE FOREGOING INJUNCTION.**

4. **Term of Injunction or Stays**. ANY INJUNCTION OR STAY ARISING UNDER OR ENTERED DURING THE BANKRUPTCY CASE UNDER BANKRUPTCY CODE §§ 105 AND 362 OR OTHERWISE THAT IS IN EXISTENCE ON THE CONFIRMATION DATE SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE LATER OF THE EFFECTIVE DATE AND THE DATE INDICATED IN THE ORDER PROVIDING FOR SUCH INJUNCTION OR STAY.

5. **Release and Covenant Not to Sue**. NOTWITHSTANDING ANYTHING SET FORTH HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE, EACH OF THE RELEASING PARTIES SHALL BE DEEMED TO HAVE IRREVOCABLY RELEASED AND DISCHARGED PNC AND ALL MANAGERS, FORMER AND CURRENT OFFICERS, CURRENT AND FORMER DIRECTORS, AGENTS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, FINANCIAL ADVISORS, AND PROFESSIONALS, IF ANY, EMPLOYED BY PNC (BUT SOLELY IN THE CAPACITIES SO EMPLOYED) OF AND FROM ANY CLAIM, CAUSE OF ACTION, RIGHT TO PAYMENT, OR LIABILITY, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR NOT ASSERTED, SCHEDULED OR NOT SCHEDULED, NOW EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, AND WHETHER ARISING UNDER THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW INCLUDING, WITHOUT LIMITATION, CAUSES OF ACTION UNDER CHAPTER 5 OF THE BANKRUPTCY CODE AND CAUSES OF ACTION ARISING UNDER, OR IN ANY WAY RELATED TO, THE PNC LOAN, ARISING FROM OR RELATED TO ACTS OR OMISSIONS OCCURRING ON OR BEFORE THE EFFECTIVE DATE, AND THE RELEASING PARTIES COVENANT NOT TO SUE PNC WITH RESPECT TO THE CLAIMS AND CAUSES OF ACTION RELEASED HEREIN (ALL OF THE FOREGOING BEING HEREIN CALLED THE "RELEASED CLAIMS"); PROVIDED, HOWEVER, THAT THE RELEASED CLAIMS SHALL NOT INCLUDE CLAIMS OR CAUSES OF ACTION OF TCI AGAINST PNC (IF ANY) THAT ARE NOT RELATED TO THE PNC LOAN, THE PROPERTIES, OR TRANSACTIONS OR MATTERS RELATING THERETO. EACH OF THE RELEASING PARTIES REPRESENTS AND WARRANTS THAT EACH SUCH RELEASING PARTY HAS NOT TRANSFERRED, PLEDGED OR OTHERWISE ASSIGNED TO ANY OTHER PERSON OR ENTITY ALL OR ANY PORTION OF ANY CLAIM RELEASED UNDER THIS SECTION OR ANY RIGHTS OR ENTITLEMENTS WITH RESPECT THERETO AND THE EFFECTUATION OF THIS RELEASE DOES NOT VIOLATE OR CONFLICT WITH THE TERMS OF ANY CONTRACT TO WHICH SUCH RELEASING PARTY IS A PARTY OR BY WHICH SUCH RELEASING PARTY OTHERWISE IS BOUND. WITHOUT LIMITING THE FOREGOING, THE CONFIRMATION ORDER SHALL INCLUDE A FINDING AND ORDER PROVIDING THAT ANY CAUSES OF ACTIONS AGAINST PNC ARISING UNDER, OR IN ANY WAY RELATED TO, THE PNC LOAN ARE PROPERTY OF THE DEBTOR'S BANKRUPTCY ESTATE, AND BY THE TERMS OF THE RELEASE CONTAINED WITHIN THIS PARAGRAPH SUCH CAUSES OF ACTION, IF ANY, ARE BARRED FROM BEING ASSERTED IN ANY MANNER BY THE DEBTOR, THE REORGANIZED DEBTOR, THE HOLDERS OF CLAIMS AGAINST THE DEBTOR, OR THE CURRENT OR FORMER HOLDERS OF EQUITY INTERESTS IN THE DEBTOR. FOR THE AVOIDANCE OF DOUBT, CAUSES OF ACTION AGAINST PNC

ARISING UNDER, OR IN ANY WAY RELATED TO, THE PNC LOAN, IF ANY, ARE BEING RELEASED BY THE RELEASING PARTIES PURSUANT TO THIS PARAGRAPH AND SUCH CAUSES OF ACTION ARE NOT RETAINED BY, VESTED IN, OR CONVEYED TO, THE REORGANIZED DEBTOR OR ANY PARTY PURSUANT TO THE PLAN OR ANY PLAN DOCUMENT. THE RELEASES IN THIS SECTION ARE SPECIFICALLY INTENDED TO OPERATE AND BE APPLICABLE EVEN IF IT IS ALLEGED, CHARGED OR PROVEN THAT ALL OR SOME OF THE CLAIMS OR DAMAGES RELEASED WERE SOLELY AND COMPLETELY CAUSED BY ANY ACTS OR OMISSIONS, WHETHER NEGLIGENT OR GROSSLY NEGLIGENT OF OR BY PNC.

6. **PNC Release and Covenant Not to Sue**. NOTWITHSTANDING ANYTHING SET FORTH HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE, PNC SHALL BE DEEMED TO HAVE IRREVOCABLY RELEASED AND DISCHARGED THE RELEASING PARTIES AND ALL MANAGERS, FORMER AND CURRENT OFFICERS, CURRENT AND FORMER DIRECTORS, AGENTS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, FINANCIAL ADVISORS, AND PROFESSIONALS, IF ANY, EMPLOYED BY ANY OF THE RELEASING PARTIES (BUT SOLELY IN THE CAPACITIES SO EMPLOYED) OF AND FROM ANY CLAIM, RIGHT TO PAYMENT, LIABILITY, OR CAUSE OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR NOT ASSERTED, SCHEDULED OR NOT SCHEDULED, NOW EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, ARISING FROM OR RELATED TO ACTS OR OMISSIONS OCCURRING ON OR BEFORE THE EFFECTIVE DATE WITH RESPECT TO CAUSES OF ACTION ARISING UNDER, OR IN ANY WAY RELATED TO, THE PNC LOAN (OTHER THAN THE RIGHTS OF PNC TO ENFORCE THE PLAN AND THE PLAN DOCUMENTS) AND PNC COVENANTS NOT TO SUE ANY OF THE RELEASING PARTIES IDENTIFIED IN THIS SECTION WITH RESPECT TO THE CLAIMS AND CAUSES OF ACTION RELEASED HEREIN (ALL OF THE FOREGOING BEING HEREIN CALLED THE "**PNC RELEASED CLAIMS**"); **PROVIDED**, **HOWEVER**, THAT NO RELEASING PARTIES SHALL BE RELEASED AND DISCHARGED FROM (AND THE PNC RELEASED CLAIMS SHALL NOT INCLUDE) OBLIGATIONS UNDER THE PLAN, THE CONFIRMATION ORDER, THE PLAN DOCUMENTS, AND CLAIMS, RIGHTS TO PAYMENT, LIABILITIES, AND CAUSES OF ACTION THAT DO NOT RELATE TO THE PNC LOAN, THE PROPERTIES OR TRANSACTIONS OR MATTERS RELATING THERETO. PNC REPRESENTS AND WARRANTS THAT PNC HAS NOT TRANSFERRED, PLEDGED OR OTHERWISE ASSIGNED TO ANY OTHER PERSON OR ENTITY ALL OR ANY PORTION OF ANY CLAIM RELEASED UNDER THIS SECTION OR ANY RIGHTS OR ENTITLEMENTS WITH RESPECT THERETO AND THE EFFECTUATION OF THIS RELEASE DOES NOT VIOLATE OR CONFLICT WITH THE TERMS OF ANY CONTRACT TO WHICH PNC IS A PARTY OR BY WHICH PNC OTHERWISE IS BOUND. THE RELEASE IN THIS SECTION IS SPECIFICALLY INTENDED TO OPERATE AND BE APPLICABLE EVEN IF IT IS ALLEGED, CHARGED OR PROVEN THAT ALL OR SOME OF THE PNC RELEASED CLAIMS WERE SOLELY AND COMPLETELY CAUSED BY ANY ACTS

**OR OMISSIONS, WHETHER NEGLIGENT OR GROSSLY NEGLIGENT OF OR BY ONE OR MORE OF THE RELEASING PARTIES.**

       7.    **Insurance**.  Confirmation and consummation of the Plan shall have no effect on insurance policies of the Debtor or its current or former directors and officers in which the Debtor or its current or former directors and officers are or were an insured party. Each insurance company is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage for the Debtor (or their current or former directors and officers) or the Reorganized Debtor on any basis regarding or related to any of the Debtor's Bankruptcy Cases, the Plan or any provision within the Plan.

       8.    **Revesting**.  As of the Effective Date, all Assets shall be transferred to, and vested in, the Reorganized Debtor free and clear of all Liens and Claims and all rights, title and interests, except as expressly set forth in the Plan and the Plan Documents.

       9.    **Other Documents and Actions**.  The Debtor, the Debtor-In-Possession, and Reorganized Debtor may execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.

       10.    **Term of Injunctions or Stays**.  Unless otherwise provided, all injunctions or stays provided for in the Debtor's Chapter 11 Bankruptcy Case pursuant to sections 105 or 362 of the Bankruptcy Code or otherwise and in effect on the Confirmation Date shall remain in full force and effect until the Effective Date.

**L.**    **Confirmability of Plan and Cramdown.**

       The Debtor requests Confirmation under section 1129(b) of the Bankruptcy Code if any impaired class does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. In that event, the Debtor reserves the right to modify the Plan to the extent, if any, that Confirmation of the Plan under section 1129(b) of the Bankruptcy Code requires modification.

**M.**    **Retention of Jurisdiction.**

       Until the Bankruptcy Case is closed, the Court will retain jurisdiction of all matters arising under, or related to, the Bankruptcy Case, including, but not limited to:

       a.    insuring that the purpose and intent of the Plan are carried out;

       b.    consideration of any modification of the Plan under Section 1127 of the Code or modification of the Plan after substantial consummation, as defined in Section 1101(2) of the Code;

       c.    hearing and determining all claims, controversies, suits, and disputes against Debtor;

       d.    hearing, determining, and enforcing all claims or causes of action which may exist on behalf of the Debtor or its estate;

e.      hearing and determining all controversies, suits, and disputes that may arise in connection with the interpretation of the Plan;

f.      hearing and determining all objections to claims, controversies, suits, and disputes that may be pending as of or initiated after the Effective Date;

g.      enforcing and interpreting, by injunction or otherwise, the terms and conditions of the Plan;

h.      entering any Order, including injunctions, necessary to enforce the rights, titles, interests, and powers of the Debtor and to impose such limitations, restrictions, terms, and conditions as may be necessary or helpful to carry out the purposes and intent of the Plan;

i.      entering an Order concluding and terminating this Chapter 11 case;

j.      correcting or curing any defect, omission, inconsistency, conflict, or error in the Plan or Confirmation Order as may be necessary or helpful to carry out the purposes and intent of the Plan;

k.      considering and acting on any matters consistent with the Plan as may be provided in the Confirmation Order; and

l.      considering the rejection of Executory Contracts that have not been rejected prior to Confirmation and adjudicating any claims for damages with respect to such rejection.

m.      Notwithstanding anything herein to the contrary, the Bankruptcy Court shall not retain jurisdiction over the obligations of the Reorganized Debtor and TCI to PNC under the Plan Documents except to the extent expressly consented to in writing by PNC in its sole and absolute discretion.

## N.      Securities Laws.

It is an integral and essential element of the Plan that the offer and issuance of equity interests of the Reorganized Debtor and the treatment of Creditors pursuant to the Plan, to the extent such interests and treatment constitute securities under the 1933 Act, shall be exempt from registration under the 1933 Act and any state or local law, pursuant to Bankruptcy Code § 1145 or other applicable exemptions, without limitation.  The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Case, the Debtor, the Reorganized Debtor, the U.S. Securities and Exchange Commission and all other federal, state and local regulatory enforcement agencies, to the effect that such offer and issuance, to the extent such equity interests of the Reorganized Debtor and treatment of Creditors constitute securities under the 1933 Act, fall within the exemption from registration under the 1933 Act and any state or local law pursuant to Bankruptcy Code § 1145.

O.    **No Requirement of Final Order.**

So long as no stay is in effect, the Effective Date of the Plan will occur notwithstanding the pendency of an appeal of the Confirmation Order or any Order related thereto. In that event, the Debtor or Reorganized Debtor may seek dismissal of any such appeal as moot following the Effective Date of the Plan.

P.    **Assumption of Allowed Claims.**

The Reorganized Debtor assumes the liability for and obligation to perform and make all distributions or payments on account of all Allowed Claims in the manner provided in the Plan.

Q.    **Attorneys' Fees and Costs.**

To the extent any holder of a Secured Claim, other than PNC, asserts a right to attorneys' fees and costs pursuant to section 506(b) of the Bankruptcy Code, unless otherwise agreed between the Debtor or Reorganized Debtor and such Secured Creditor, the allowance of such fees and expenses shall be handled as set forth in the Plan. Within twenty (20) days after the Effective Date, the Secured Creditor shall file an application with the Bankruptcy Court for allowance of such fees and expenses. Such application will follow the same rules and guidelines as a fee application for a Professional seeking compensation from the Debtor, including the U.S. Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses. Within twenty (20) days after such application is filed, the Reorganized Debtor may file any objections thereto, and the Secured Creditor shall file any response within twelve (12) days thereafter. If the Secured Creditor and the Reorganized Debtor are unable to reach agreement, the matter shall then be submitted to the Bankruptcy Court for determination on no less than twenty (20) days notice of the hearing.

R.    **Post-Petition Taxes and Insurance.**

Funds for payment of post-petition property taxes and insurance will be deposited each month as part of each respective Property's monthly operating expenses into a real estate tax escrow account to be held by PNC and will be paid when such taxes and/or insurance become due and payable under the laws of the applicable taxing jurisdiction.

S.    **Exemption from Transfer Taxes and Recording Fees.**

In accordance with Bankruptcy Code § 1146(a), none of the issuance, transfer or exchange of any securities under the Plan, the release of any mortgage, deed of trust or other Lien, the making, assignment, filing or recording of any lease or sublease, the vesting or transfer of title to or ownership of any of the Debtor's interests in any property, or the making or delivery of any deed, bill of sale or other instrument of transfer under, in furtherance of, or in connection with the Plan, including the releases of Liens contemplated under the Plan, shall be subject to any document recording tax, stamp tax, conveyance fee, sales or use tax, bulk sale tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment in the United States. The Confirmation Order shall direct the appropriate federal, state and/or local governmental officials or agents to forgo the collection of any such tax or

governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**T.**     **Modification of Plan.**

The Plan Proponents may alter, amend, or modify the Plan or any Plan Documents under Bankruptcy Code § 1127(a) at any time prior to the Confirmation Date.  After the Confirmation Date and prior to the Effective Date, the Plan Proponents may, under Bankruptcy Code § 1127(b), (i) amend the Plan so long as such amendment shall not materially and adversely affect the treatment of any holder of a Claim, (ii) institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and (iii) amend the Plan as may be necessary to carry out the purposes and effects of the Plan so long as such amendment does not materially or adversely affect the treatment of holders of Claims or Equity Interests under the Plan; provided, however, prior notice of any amendment shall be served in accordance with the Bankruptcy Rules or Order of the Bankruptcy Court.

**U.**     **Waiver of Stay.**

Notwithstanding Bankruptcy Rules 3002(e), 6004(h), and 6006(d), the Debtor shall be authorized to consummate the Plan and the transactions and transfers contemplated thereby immediately after entry of the Confirmation Order.

**VIII.**
**FEASIBILITY OF THE PLAN**

**A.**     **Feasibility**

The Debtor believes that the Plan is feasible based upon the projected revenue of the Properties, the financial condition of the Debtor and TCI, the funds TCI will deposit to secure its promised contributions under the Plan, the funds that TCI has agreed to contribute to the Debtor and its obligation to fund such amounts necessary to consummate the Plan, and the likelihood of sales of certain of the Properties within a five year period.

TCI is a publicly owned Nevada corporation whose shares are traded on the New York Stock Exchange under the symbol "TCI". TCI's shares are currently trading for approximately $2.23 per share. During the last 52 weeks, TCI's shares have traded in the range of $2.23/share to $10.00/share. TCI owns numerous commercial properties with a book value in excess of $1.6 billion dollars in Texas and elsewhere within the United States, including 57 apartment complexes, 28 commercial properties, and approximately 6,800 acres of commercial real estate. As a publicly held company, TCI files periodic reports with the United States Security & Exchange Commission ("SEC"), including annual and quarterly financial reports commonly known and referred to as "10-K's" and "10-Q's". Creditors and parties in interest are encouraged to review TCI's most recent SEC filings and reports for a more detailed and comprehensive description of TCI's business, assets, debts, financial condition, and transactions. Such SEC reports may be viewed at TCI's website: www.transconrealty-invest.com or may be obtained by contacting TCI's investor relations department. Additionally, such reports and filings may be

obtained on-line from a number of websites, including the EDGAR database maintained by the SEC at www.sec.gov/edgar.

Subject to applicable securities laws and restrictions and any confidentiality or nondisclosure agreement deemed necessary or advisable by TCI or its counsel, TCI is willing to provide such additional "non-public" information regarding its financial condition, properties, or activities as any Claimant may reasonably request in order to evaluate such matters and TCI's ability to fund the Plan, provided, however, that any such additional disclosures by TCI to such requesting party does not violate or contravene Sections 1125 or 1126 of the Bankruptcy Code regarding the contents of this Disclosure Statement or the solicitation of acceptances for the Plan.

 1.  **Projections**.

The Debtor believes that the market and economic situation surrounding the operation of the Debtor's Properties is highly competitive, volatile, speculative, and uncertain. For such reasons, Debtor's management also believes that it is very difficult to predict and project the financial performance of the Properties. Consequently, the financial projections for the Properties attached to this Disclosure Statement represent management's best estimation of the anticipated results of future operations based upon management's experience in the industry and its familiarity with the respective markets in which the Properties are located due to having operated, leased, and managed the Properties for a significant number of years previously. Notwithstanding, there can be no assurance or guaranty that such projections will be realized or achieved, and any reliance upon such financial projections must be qualified by such matters. The Debtor's projected budget for the final four months of year 2011 and all of 2012 are attached to this disclosure statement as **Exhibit C** and its financial projections through the end of 2012, including anticipated contributions from TCI, are attached to this disclosure statement as **Exhibit D**.

The Debtor has also prepared a liquidation analysis, a copy of which is attached hereto as **Exhibit E**. The Liquidation Analysis provides an estimate by the Debtor of the recovery of Creditors in the event of a chapter 7 bankruptcy.

Debtor's management believes that that opportunities to lease vacant space in the 1010 Common Property will increase over the next five years as the market improves and as management continues to implement marketing strategies designed to increase the amount of leases at the 1010 Common Property, which improvements could have a positive effect on the attached projections.

Debtor's management also believes that opportunities to sell the Debtor's Properties will increase over the next five years as the market improves.

**B.**  **Alternatives to Confirmation of the Plan**

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Chapter 11 bankruptcy case, (b) the Debtor's Chapter 11 bankruptcy case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of reorganization proposed by some other party.

1. **Dismissal**.

If the Debtor's bankruptcy case were to be dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Each of the holders of Secured Claims would then have the right to exercise their rights as secured creditors to foreclose and liquidate the Debtor's assets constituting their respective Collateral. In the event of dismissal, it is very doubtful that TCI would fund or contribute any amounts to the Debtor to pay Creditors. In such event, most, if not all, unsecured creditors would likely fail to realize any significant recovery on their claims.

2. **Chapter 7 Liquidation**.

If the Plan is not confirmed, it is possible that the Debtor's Chapter 11 case will be converted to a case under Chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, secured creditors, Administrative Claims, and Priority Claims are entitled to be paid in cash and in full before unsecured creditors receive any funds.

If the Debtor's Chapter 11 case is converted to Chapter 7, the present Priority Claims may have a priority lower than priority claims generated by the Chapter 7 cases, such as the Chapter 7 trustee's fees or the fees of attorneys, accountants and other professionals engaged by the trustee.

The Debtor believes that liquidation under Chapter 7 would result in significantly less distributions to unsecured creditors and to Administrative and Priority Claimants. In the event that the Debtor's Assets were liquidated, and if a receiver or trustee were appointed to supervise the liquidation of the Debtor's Assets, there would be significant costs associated with such liquidation, and such costs would increase due to fees and charges for such persons. It is unlikely that such property would be sufficient to enable the Debtor or a Trustee to make any significant distribution to unsecured creditors because Administrative and Priority Claims, Secured Tax Claims, and PNC's Secured Claim would consume a significant portion, if not all, of such proceeds. Consequently, the Debtor believes that it is highly unlikely that creditors other than such Claimants would receive anything or any significant payment in a Chapter 7 liquidation. Moreover, the conversion to Chapter 7 would give rise to additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee. In a Chapter 7 liquidation, it is likely that general unsecured creditors would receive little distribution on their claims, and the timing of any such distribution is uncertain and would be conditioned upon the ability to liquidate the Debtor's assets in a depressed real estate market.

The Debtor's Liquidation Analysis is attached hereto as **Exhibit E**.

3. **Confirmation of an Alternative Plan**.

If the Plan is not confirmed, it is possible that a creditor or third party would file and pursue confirmation of an alternative plan. The Debtor does not believe that any creditor or third party is likely to propose an alternative reorganization plan. The Debtor believes the Plan

provides the best prospect for reorganizing the Debtor and maximizing creditor recoveries that can be achieved quickly. The Debtor believes that any material delay in the Debtor's exit from bankruptcy will harm its business and lessen creditor recoveries. By exiting bankruptcy, the Debtor will eliminate the expense of being in bankruptcy.

## IX.
## RISK FACTORS

The primary risk factor associated with the Plan is the Debtor's ability to increase leased space at the 1010 Common Property and to operate it following Confirmation and sell certain of the Properties so as to generate net operating income by which to pay the Claims required under the Plan. There can be no assurance that leased space will significantly increase any time within the foreseeable future, or that the Properties can generate sufficient net operating income to meet the interest service requirements to PNC or other Plan payments. The Debtor does not believe that the Properties will decline in value pending its reorganization efforts and believes that the payments that will be made to PNC and other Creditors on the Effective Date and thereafter during such period will adequately protect the their respective interests and that any improvements made to the Properties will maintain or increase the Properties' respective values.

An additional risk factor is the inability of TCI to fund the Debtor's operations following Confirmation as required by the Plan and the Plan Documents. TCI has committed to the Debtor and the Reorganized Debtor (as applicable) that it or its designee will fund the initial plan payments required on the Plan's Effective Date and will fund the payments required under the Plan during the remaining life of the Plan so that the Plan is feasible; however, creditors may not receive distributions to the extent that TCI is unable to comply with its obligations.

Section 1129 of the Bankruptcy Code provides certain requirements for a chapter 11 plan to be confirmed. Parties-in-interest may object to confirmation of a plan based on an alleged failure to fulfill these requirements or other reasons. The Debtor believes that the Plan complies with the requirements of the Bankruptcy Code.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each class of Claims and Equity Interests encompass Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such class.

The Debtor cannot ensure it will receive enough acceptances to confirm the Plan. But, even if the Debtor does receive enough acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. Even if enough acceptances are received and, with respect to those Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan or may require additional solicitations or consents prior to confirming the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtor was liquidated under chapter 7 of the

Bankruptcy Code.  Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtor's ability to propose and confirm an alternative plan is uncertain. Confirmation of any alternative plan under chapter 11 of the Bankruptcy Code would likely take significantly more time and result in delays in the ultimate distributions to the holders of Claims. If confirmation of an alternative plan is not possible, the Debtor would likely be liquidated under chapter 7.  Based upon the Debtor's analysis, liquidation under chapter 7 would result in distributions of reduced value, if any, to holders of Claims and Equity Interests.

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order approving any transactions contemplated thereunder.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met or that the other conditions to consummation, if any, will be satisfied.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and effectuated and the liquidation completed.

Although the Debtor believes that the Effective Date may occur within a reasonable time following the Confirmation Date, there can be no assurance as to such timing.

## X.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

### A.    General.

Under the Internal Revenue Code of 1986, as amended (the "Tax Code"), there could be certain significant federal income tax consequences associated with the Plan described in this Disclosure Statement.  Certain of these consequences are discussed below.  Due to the unsettled nature of certain of the tax issues presented by the Plan, the differences in the nature of Claims of the various creditors, their taxpayer status, residence and methods of accounting (including creditors within the same creditor class) and prior actions taken by creditors with respect to their Claims, as well as the possibility that events or legislation subsequent to the date hereof could change the federal tax consequences of the transactions, the tax consequences described below are subject to significant considerations applicable to each creditor.  **HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS RESPECTING THE INDIVIDUAL TAX CONSEQUENCES OF THE TRANSACTIONS, CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES**.

### B.    Tax Consequences to the Debtor.

Material tax consequences may exist with respect to the Debtor and its equity holders from the Plan due to the change in ownership from ABC to TCI.  To the extent any of its debts are discharged under the Plan, Debtor does not believe such discharge will result in any "discharge of indebtedness" income, although other tax attributes of Debtor, such as the amount of its net operating loss carrybacks or carryovers may be reduced or affected thereby.

## C.    Tax Consequences to Creditors.

The tax consequences of the implementation of the Plan to a creditor will depend in part on whether the creditor's present debt constitutes a "security" for federal income tax purposes, the type of consideration received by the creditor in exchange for its Allowed Claim, whether the creditor reports income on the accrual or cash basis, whether the creditor receives consideration in more than one tax year of the creditor, whether the creditor is a resident of the United States, and whether all the consideration received by the creditor is deemed to be received by that creditor in an integrated transaction. The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest".

## D.    Creditors Receiving Solely Cash.

A creditor who receives cash in full satisfaction of its Claim will be required to recognize gain or loss on the exchange. The creditor will recognize gain or loss equal to the difference between the amount realized in respect of such Claim and the creditor's tax basis in the Claim.

## E.    Backup Withholding.

Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding". Withholding generally applies if the holder: (a) fails to furnish his social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.

**XI.**
**CONCLUSION**

This Disclosure Statement has attempted to provide information regarding the Debtor's estate and the potential benefits that might accrue to holders of Claims against and Interests in the Debtor under the Plan as proposed. The Plan is the result of the effort of the Debtor and its advisors and management to pay allowed claims against it. The Debtor believes that the Plan is feasible and will provide each holder of a Claim against the Debtor with an opportunity to receive greater benefits than those that would be received by termination of the Debtor's business and the liquidation of its assets, or by any alternative plan. The Debtor, therefore, hereby urges you to vote in favor of the Plan.

**Whether or not you expect to attend the Confirmation Hearing, which is scheduled to commence on \_\_\_\_, 2011, at \_\_\_:\_\_\_ \_\_.m. Dallas, Texas Time, you must sign, date, and mail your ballot as soon as possible for the purpose of having your vote count at such hearing. All ballots must be returned to: Melissa Hayward, Counsel for the Debtor, Franklin Skierski Lovall Hayward LLP, 10501 N. Central Expy., Suite 106, Dallas, Texas 75231. All ballots must be returned on or before 5:00 p.m. Dallas, Texas Time on \_\_\_\_\_, 2011. Any ballot which is illegible or which fails to designate an acceptance or rejection of the Plan will not be counted.**

Dated:  June 15, 2011


**CONTINENTAL COMMON, INC.**
**Debtor and Debtor-In-Possession**

By: /s/ Craig Landess_____
      **Craig Landess, Vice President**

**FRANKLIN SKIERSKI LOVALL HAYWARD LLP**

**Counsel to Debtor and Debtor-In-Possession**

By:  /s/ Melissa S. Hayward_____
Melissa S. Hayward
State Bar No. 24044908
10501 N. Central Expy, Ste. 106
Dallas, Texas  75231
Telephone: (972) 755-7100
Facsimile:  (972) 755-7110